# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

DYLIN ACKAH-ESSIEN,

    Defendant-Appellant.

FOR PUBLICATION
June 4, 2015
9:05 a.m.

No. 317411
Cass Circuit Court
LC No. 12-010170-FC

Before: RIORDAN, P.J., and MARKEY and WILDER, JJ.

MARKEY, J.

Defendant appeals by right his convictions following a jury trial of conspiracy to commit armed robbery, MCL 750.529, armed robbery, MCL 750.529, unlawful imprisonment, MCL 750.349b, larceny from a motor vehicle, MCL 750.356a(1), carrying a weapon with unlawful intent, MCL 750.226, unlawfully driving away an automobile, MCL 750.413, larceny in a building, MCL 750.360; and receiving and concealing stolen property $200 or more but less than $1,000, MCL 750.535(4)(a). The trial court sentenced defendant to concurrent prison terms of 8 to 20 years for the conspiracy and armed robbery convictions, 4 to 15 years for the unlawful imprisonment conviction, and time already served for the remaining convictions. We affirm but vacate defendant's conviction and sentence for carrying a dangerous weapon with unlawful intent. The evidence established that defendant used a BB gun; however, a BB gun does not come within the meaning of "any other dangerous or deadly weapon or instrument" under MCL 750.226.

## I. FACTUAL SUMMARY

Defendant's convictions arise out of the robbery of a 21-year-old delivering pizza to four young men who had conspired to commit the crime by having a female friend place an order for food to be delivered to an abandoned house. The trial resulting in defendant's convictions was the second; defendant's first trial resulted in the trial court declaring a mistrial when the jury was unable to reach a verdict.

The testimony at trial showed Michael Smith and Anteyon Russell were identified from their clothing as two of three or four black males that a citizen had observed near the scene of the crime. Russell pleaded guilty to conspiracy to commit armed robbery and several other crimes as part of an agreement for his truthful testimony against defendant in the instant case. Detective Dan Wiggins obtained the fingerprints of Smith and Martrell Jones from pizza boxes he located

during the criminal investigation. Jones entered into a guilty plea on multiple charges for the armed robbery of the victim as part of a plea agreement for the dismissal of certain charged offenses in exchange for his truthful testimony against defendant in the instant case.

Martrell Jones testified that he lived in Chicago where he met Michael Smith and defendant through his high school football team. In early April 2012, Jones was on spring break and decided to go to Michigan for a basketball tournament at Smith's invitation. Defendant came with Jones and Smith on a train from Chicago to South Bend; all three are friends. Defendant paid Smith's travel expenses. Smith asked his uncle, Paul Williams, to pick him up at the South Bend Airport, where a train from Chicago also deposits passengers. When Williams arrived, Jones and defendant were also there, and Williams took the three of them to his home near Walter Ward Park in Dowagiac.

Anteyon Russell testified that after defendant, Smith, and Jones got to Dowagiac, defendant, an acquaintance of Anteyon, but not a friend, suggested the idea of committing an armed robbery. According to Anteyon, defendant said he had done "home delivery robberies" of pizza delivery men in Wisconsin. Rolandis Russell is the older brother of Anteyon. Anteyon had been in the company of Smith, Jones and defendant a few days before the robbery. Rolandis heard defendant suggest a robbery, but Rolandis declined to participate.

Jones testified that defendant, Anteyon, and Smith smoked marijuana and played basketball the morning of the robbery. Defendant suggested they commit an armed robbery, as he had done the day before. Jones first declined, but defendant said that he needed money to get back to Chicago. Defendant specifically suggested robbing a delivery person. Smith testified for defendant, and claimed that sometime later, while he and the codefendants were playing inside Williams' house with a rifle-type BB or pellet gun, they shot out the glass on a stove with it. Williams asked them to leave his home as a consequence.

Anteyon testified that the four men met at Anteyon's grandmother's house before leaving to play basketball and again shoot a BB gun recreationally. Defendant again brought up the topic of a robbery, saying he knew who to call and "set it up." The codefendants found an empty house and determined it would be a suitable location for the planned crime. Anteyon suggested he had a gun that might work and went home to obtain a black BB gun pistol that was later used in the robbery of the victim. Anteyon gave the black BB gun to defendant. Anteyon also testified that once he was back at the unoccupied house, which had no electricity, defendant called a female friend to place an order with Pizza Hut. While the group waited inside the house for the pizza to arrive, they drank a pint of whiskey and planned "who was gonna do what."

Jones testified that Anteyon went to his grandmother's house to change his clothes and get a BB gun, which looked like a "handgun." Someone suggested they call Pizza Hut, and defendant called his girlfriend to have her do so, instructing her to "get a lot of pizzas," and giving her an address for the delivery. The group then walked to the vacant house they had earlier selected to wait and planned "who would do what." Defendant, who asked to be called "Pistol," elected to hold the gun to the victim's face, while Smith held the victim and Anteyon went through his pockets. Jones agreed to take the victim's car and be the driver.

Anteyon further testified that when car lights appeared from down the street, Jones went out the back sliding door; defendant and Smith went outside to the front, and Anteyon waited inside the house. Defendant was to initiate the robbery by signaling with the words, "Dad, the pizza man here [sic]." Anteyon heard the signal from defendant and once the crime was underway, went though the victim's pockets as planned. Anteyon took money, a cellular telephone and a Nintendo DS game system from the victim. Jones testified that when the group saw the victim's car approaching, Jones went out the side door to position himself out front to steal the victim's car. After Smith "lured" the victim into the house, Jones jumped in the car and confirmed the keys were in it. Anteyon came out of the house with the victim's wallet but went back for the pizzas. Smith and defendant then came out, and the four drove off.

Anteyon testified that after the robbery, the four men got into the victim's car and drove off in it, with Jones driving as planned. They drove through a cornfield and stopped along the way near a railroad viaduct so Anteyon could throw the victim's cellular telephone out the car window, fearing its GPS tracking device. He also disposed of a Nintendo DS game. Defendant never gave Anteyon his gun back, which Anteyon last saw when defendant was brandishing it during the crime. According to Anteyon, defendant tried to remove the license plate from the victim's car because he wanted to take the car back to Chicago.

Jones testified that defendant originally wanted to drive back to Chicago, but Jones did not know how to drive. As they were making their escape, Jones slowed, and Anteyon threw the victim's cellular telephone out the window. They proceeded through a field before taking a laptop computer from the back seat and abandoning the car. Defendant and the group divided the money, ate pizza and recapped the crime. Anteyon testified that the four men split the victim's cash equally, ate pizza, boasted about their roles in the crime and "getting away with it." Later, Rolandis picked up Smith and Anteyon and took them back to Anteyon's grandmother's house. Smith then asked Anteyon to walk him home, and as they did so, the police stopped them and inquired about the robbery. Smith and Anteyon lied to the police, denying any knowledge of the crime. Jones testified that Smith left with Anteyon but returned some time later, saying that "the cops was on to us." Jones, Smith and defendant called another uncle of Smith's who drove them to the South Bend Airport, where they took a train back to Chicago.

Smith, a childhood friend of Anteyon's from Dowagiac who had moved to Chicago, testified for the defense that he had contacted Anteyon in advance to make arrangements to get together while Smith was in town. Smith also testified that he, Jones and Anteyon planned the robbery of the victim. Smith testified that he had pleaded guilty to his involvement in the robbery and that defendant was not involved in either the planning or commission of the robbery. During cross-examination, Smith admitted that during the course of the investigation, he told the police on two separate occasions that defendant was involved in the robbery and told them that defendant pointed the gun at the victim. While Smith denied that a gun was used in the crime, he testified when he entered his guilty plea that "[a] pellet gun, BB gun," was used in the crime.

Defendant testified that contrary to the rendition of events by Anteyon and Jones, after the basketball activity, he left by himself and went to Louis Thomas's apartment. When he arrived there at 7:00 p.m., no one was home. He watched movies and a basketball game alone, until Jones, Smith and Anteyon arrived about 10:00 p.m. Defendant was surprised to see they had pizza boxes, a laptop computer and $50 to $75 in cash, since neither Smith nor Jones had

any money when they left Chicago. Defendant testified that none of the three told him anything about a robbery that night or anytime while they were in Dowagiac, and defendant never saw a BB pistol the entire time he was in Dowagiac. Defendant was surprised to learn about the robbery when Smith told him the following Monday.

The jury convicted defendant for the crimes listed above, and the trial court sentenced defendant as noted. Defendant now appeals by right his convictions and sentences.

## II. MCL 750.226—BB GUN

Defendant first argues that his conviction for carrying a weapon with unlawful intent, MCL 750.226, cannot stand because the evidence only established the use of a BB gun. Defendant argues a BB gun does not qualify as a "pistol or other firearm . . . or any other dangerous or deadly weapon" under the statute and that the trial court's instruction regarding this offense was erroneous. Because as we discuss later, we agree that the evidence was insufficient to sustain defendant's conviction of this offense and because defendant waived any claim of instructional error, we need not specifically further address this aspect of defendant's argument.

## A. STANDARD OF REVIEW

Issues of statutory interpretation present questions of law that are reviewed de novo. *People v Cole*, 491 Mich 325, 330; 817 NW2d 497 (2012). But where, as here, a claim of error is not preserved, we consider whether plain error affected defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Plain error affects a defendant's substantial rights when it affects the outcome of the proceedings. *Id.*; *People v Vaughn*, 491 Mich 642, 665; 821 NW2d 288 (2012).

## B. ANALYSIS

The information alleged that on or about April 4, 2012, defendant "did, with intent to use the same against the person of another, go armed with a pellet gun; contrary to MCL 750.226." The cited statute provides, in pertinent part:

> Any person who, with intent to use the same unlawfully against the person of another, goes armed with a pistol or other firearm or dagger, dirk, razor, stiletto, or knife having a blade over 3 inches in length, *or any other dangerous or deadly weapon or instrument*, shall be guilty of a felony. . . . [Emphasis added.]

This Court recently reviewed the elements necessary to sustain a conviction of carrying dangerous weapon with unlawful intent under MCL 750.226. *People v Mitchell*, 301 Mich App 282, 292-293; 835 NW2d 615 (2013) (holding that although the word "carrying" is used in the catch line of the statute, it is not an element of the offense). To establish this charge, the prosecution must prove beyond a reasonable doubt that the accused (1) "goes armed"—while possessing a firearm or dangerous weapon, moves from one location to another location—and (2) at the time of "going armed," had the intent to use the weapon unlawfully against another person. *Id.* at 293.

-4-

The evidence at trial established that the weapon defendant used in the instant case was a handgun-style BB gun that appeared to the victim to be a "real" gun. Under the clear language of the statute, the BB gun described as being used in the instant case does not come within the list of weapons or instruments specifically enumerated in MCL 750.226, *i.e.*, "a pistol or other firearm or dagger, dirk, razor, stiletto, or knife having a blade over 3 inches in length." The weapons or instruments specifically named in MCL 750.226's list are dangerous per se. *People v Parker*, 288 Mich App 500, 507; 795 NW2d 596 (2010). The prosecution argues to the contrary, that the BB gun that defendant used was a dangerous weapon per se, based on evidence that the gun "broke the window to Williams' stove." We conclude this argument is not supported by the evidence. We assume the prosecution is referring to the testimony of Anteyon, who described some horseplay before the crime where he, defendant and the other conspirators were playing with "long BB guns" inside Williams' house and that one of them had shot out the stove glass with it. But Jones also testified that the BB gun used in the crime looked like a handgun; the victim said he reflexively swatted it away when it was pointed in his face, and that the man with the gun was called "Pistol" by his compatriots. Therefore, the evidence shows that the BB gun that shot out the stove glass was different from the BB gun used to rob the victim. Since a BB gun is not among the weapons or instruments listed in MCL 750.226, it is not a dangerous weapon per se. *Parker*, 288 Mich App at 507. Therefore, the BB gun must be construed as falling within the catchall language of "any other dangerous or deadly weapon or instrument," MCL 750.226, in order to sustain defendant's conviction.

MCL 750.226 does not define what comprises "or any other dangerous or deadly weapon or instruments," or whether a BB gun is included, the statute's prohibition against "going armed with a firearm [1] or dangerous weapon, with the intent to unlawfully use the weapon against another person." Because the Legislature has not expressly defined the general language "or any other dangerous or deadly weapon or instrument" as used in MCL 750.226, it is open to more than one reasonable meaning. A statutory provision is ambiguous only if it irreconcilably conflicts with another provision, or it is equally susceptible to more than a single meaning. *People v Gardner*, 482 Mich 41, 50 n 12; 753 NW2d 78 (2008). Consequently, statutory construction is required. See *People v Feezel*, 486 Mich 184, 205; 783 NW2d 67 (2010) ("When a statute is ambiguous, judicial construction is appropriate to determine the statute's meaning.").

The primary goal when construing a statute is to give effect to the Legislature's intent. *Id.*; *Mitchell*, 301 Mich App at 291. The most reliable source regarding the Legislature's intent is the language used in the statute. *People v Cole*, 491 Mich 325, 330; 817 NW2d 497 (2012); *Mitchell*, 301 Mich App at 291. When the statutory language is plain and unambiguous, the Legislature's intent is clearly expressed, and judicial construction is neither permitted nor required. *Id.* In construing statutes, this Court applies a reasonable construction of the statute,

---

[1] The prosecution concedes that "certain BB guns are not considered firearms under the penal code," citing MCL 750.222(d). That subsection defines "firearm" to mean "a weapon from which a dangerous projectile may be propelled by an explosive, or by gas or air[,]" but excludes from the definition "a smooth bore rifle or handgun designed and manufactured exclusively for propelling by a spring, or by gas or air, BBs not exceeding .177 caliber."

enforces clear statutory language as written, and reconciles any apparent inconsistencies if possible. *Feezel*, 486 Mich at 205. "Unless they are otherwise defined in the statute or are terms of art or technical words, we assign the words of a statute their plain and ordinary meaning." *People v Haynes*, 281 Mich App 27, 29; 760 NW2d 283 (2008). If a statute specifically defines a term, the statutory definition is controlling. *People v Williams*, 298 Mich App 121, 126; 825 NW2d 671 (2012). A court may consult dictionary definitions regarding the plain and ordinary meaning of undefined terms. *Mitchell*, 301 Mich App at 291. Technical words and phrases that have acquired a peculiar and appropriate meaning in law shall be construed and interpreted in accordance with that meaning. See MCL 8.3a. Moreover, it is presumed that the Legislature is aware of and must have considered the effect on all existing statutes when enacting new laws. *Feezel*, 486 Mich at 211.

We first review the plain and ordinary meaning of the words used in the phrase "or any other dangerous or deadly weapon or instruments." We consult *Merriam-Webster's Collegiate Dictionary* (11th ed, 2014) to determine the plain meaning of "dangerous," "deadly," "weapon," and "instrument." "Dangerous" is defined as "exposing to or involving danger." *Id.*, p 315. "Danger," in turn, is defined as "exposure or liability to injury, pain, harm, or loss." *Id.* "Deadly" is defined as "likely to cause or capable of producing death." *Id.*, p 319. And "weapon" is defined as "something (as a club, knife, or gun) used to injure, defeat, or destroy." *Id.*, p 1417. Finally, the word "instrument," in this instance clearly not used in its musical or written context, is defined as "a means by which something is achieved, performed, or furthered." *Id.*, p 649. "It is well known that a term can be defined in a number of different ways; therefore, when interpreting a statute, this Court is to 'determine the most pertinent definition of a word in light of its context.' " *People v Hershey*, 303 Mich App 330, 339; 844 NW2d 127 (2013) (citation omitted). In light of purpose of the statute, the context in which the words are used, and prior judicial interpretations of the statute, we conclude that for criminal liability to attach under MCL 750.226 for "going armed" with a non-specified "weapon" or "instrument," the potential for physical injury or death must exist with respect to the use of the "weapon" or "instrument."

Our primary goal in reading the statute is to effectuate the intent of Legislature and enforce its clear statutory language in light of the purpose of the statute. *Feezel*, 486 Mich at 205; *Mitchell*, 301 Mich App at 291. In construing the related MCL 750.227 that prohibits the carrying of a concealed weapon, our Supreme Court employed the rule of construction known as "*ejusdem generis*" as an aid to ascertain and give effect to the Legislature's intent. *People v Smith*, 393 Mich 432, 436; 225 NW2d 165 (1975). The statutory language at issue in *Smith* was the meaning of "a dagger, dirk, stiletto, or *other dangerous weapon except hunting knives adapted and carried as such.*" *Smith*, 393 Mich at 435, quoting MCL 750.227. The *Smith* Court explained that according to the rule of *ejusdem generis*, "a statute in which general words follow a designation of particular subjects, the meaning of the general words will ordinarily be presumed to be and construed as restricted by the particular designation and as including only things of the same kind, class, character or nature as those specifically enumerated." *Smith*, 393 Mich at 436. The Court held that although an M-1 rifle is a dangerous weapon, it did not come within the meaning of "other dangerous weapon" that was delineated by examples of and thereby limited to stabbing weapons. *Id.* In this case, when the rule of *ejusdem generis* is applied to MCL 750.226's inclusion of these general words, "*other dangerous or deadly weapon or instrument,*" the meaning of the general words must be limited to the same general kind or class

-6-

as those specifically mentioned. *Smith*, 393 Mich at 436. Thus, the general phrase "any other dangerous or deadly weapon or instrument" must be construed to include "weapons" or "instruments" that are dangerous per se, i.e., are of the same kind as "a pistol or other firearm or dagger, dirk, razor, stiletto, or knife having a blade over 3 inches in length," that are specifically enumerated in MCL 750.226. See *Parker*, 288 Mich App at 506-508.

Another "general rule of statutory construction is that the Legislature is 'presumed to know of and legislate in harmony with existing laws.'" *People v Cash*, 419 Mich 230, 241; 351 NW2d 822 (1984)(citation omitted). Since at least 1992 PA 217, pertinent to the firearms chapter of the Michigan Penal Code containing MCL 750.226, the Legislature has defined "firearm" to exclude "a smooth bore rifle or handgun designed and manufactured exclusively for propelling by a spring, or by gas or air, BBs not exceeding .177 caliber." MCL 750.222(d). Indeed, the Legislature has excluded smooth-bore, .177 caliber BB guns from the definition of "firearm" as used in other statutes:

> The word "firearm", except as otherwise specifically defined in the statutes, shall be construed to include any weapon from which a dangerous projectile may be propelled by using explosives, gas or air as a means of propulsion, except any smooth bore rifle or handgun designed and manufactured exclusively for propelling BB's not exceeding .177 calibre by means of spring, gas or air. [MCL 8.3t (1959 PA 189).]

Because the Legislature has excluded through both MCL 750.222(d) and MCL 8.3t smooth-bore BB guns that propel BBs not exceeding .177 caliber from the meaning of "firearm" as used MCL 750.226, it is reasonable to infer that the Legislature did not intend to include BB guns of this type within the catchall phrase "or any other dangerous or deadly weapon or instrument" under MCL 750.226. Stated otherwise, by excluding smooth-bore BB guns that propel BBs not exceeding .177 caliber from the meaning of "firearm," the Legislature must have determined that such a BB gun was not a "dangerous or deadly weapon or instrument." See, e.g., *Parker*, 288 Mich App at 507-508 (including knives with blades more than three inches in length as dangerous weapons per se indicates that knives with shorter blades are not dangerous per se and thus not included within the phrase "any other dangerous or deadly weapon or instrument"). We therefore hold that a BB gun as defined in MCL 750.222(d) is excluded from the meaning of "any other dangerous or deadly weapon or instrument" in MCL 750.226.

We next consider whether there was sufficient evidence to sustain defendant's conviction under MCL 750.226. In reviewing sufficiency of the evidence claims, all conflicts in the evidence must be resolved in favor of the prosecution, and an appellate court may not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses. *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). Although, "the prosecutor need not negate every reasonable theory consistent with innocence," it must produce evidence from which all elements of an offense may be determined beyond a reasonable doubt. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). We must "draw all reasonable inferences and make credibility choices in support of the jury verdict" when determining whether the prosecution has sustained its burden. *Id*.

In applying this deferential review standard, we conclude the evidence shows that defendant went from one place to another while possessing a handgun-style BB gun with the intent to use the weapon unlawfully against another person. *Mitchell*, 301 Mich App at 293. The prosecution argues that the BB gun defendant used was a dangerous weapon per se because before the robbery it was used to shoot out the glass of a stove. But as discussed already, that reading of the record is not accurate; the testimony showed it was a long, rifle-type BB or pellet gun that shot out the glass of Williams' stove. In this case, as in *Parker*, the prosecution presented no evidence that the BB gun in question was a dangerous weapon per se. Instead, the record shows that the weapon defendant used was a handgun-style BB gun. There was no evidence presented at trial that the handgun-style BB gun defendant used in the robbery was anything other than "a smooth bore . . . handgun designed and manufactured exclusively for propelling by a spring, or by gas or air, BBs not exceeding .177 caliber." MCL 750.222(2). For the reasons previously discussed, such a BB gun does not come within meaning of "any other dangerous or deadly weapon or instrument" under MCL 750.226. Consequently, the evidence was insufficient to prove all the elements of MCL 750.226, and defendant's conviction of that offense cannot be sustained. *Mitchell*, 301 Mich App at 294; *Parker*, 288 Mich App at 509.

## III. DOUBLE JEOPARDY

Defendant next argues that because his first trial ended without his consent and manifest necessity did not support a mistrial, his second trial violated the Double Jeopardy Clause of the United States Constitution. The prosecution asserts the requisite manifest necessity supported the trial court's decision to declare a mistrial because the jury in defendant's first trial remained deadlocked after several hours of deliberation and after receiving the deadlocked jury instruction. We conclude that defendant's retrial, following the trial court's declaration of a mistrial in his first trial, did not violate the successive prosecutions protections of the Double Jeopardy Clause.

### A. PRESERVATION

To preserve appellate review of a double-jeopardy violation, a defendant must object at the trial court level. *People v Meshell*, 265 Mich App 616, 628; 696 NW2d 754 (2005). Defendant did not object to the trial court's decision to declare a mistrial at the time that it did so, or during defendant's second trial; consequently, his double-jeopardy claim is unpreserved. *Id.*; *People v McGee*, 280 Mich App 680, 682; 761 NW2d 743 (2008).

### B. STANDARD OF REVIEW

A constitutional double jeopardy challenge presents a question of law reviewed de novo on appeal. *People v Ream*, 481 Mich 223, 226; 750 NW2d 536 (2008). In this case, the unpreserved double-jeopardy claim is reviewed for plain error affecting the defendant's substantial rights. *Meshell*, 265 Mich App at 628. Reversal is warranted only if the error resulted in a conviction despite the defendant's actual innocence, or if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of the defendant's innocence. *Meshell*, 265 Mich App at 628, citing *Carines*, 460 Mich at 763.

The decision to declare a mistrial after a finding of manifest necessity because of a deadlocked jury is entrusted to the "sound discretion" of the trial court. *People v Lett*, 466 Mich

206, 216-217; 644 NW2d 743 (2002), quoting *United States v Perez*, 22 US (9 Wheat) 579, 580; 6 L Ed 165 (1824). On appeal, the trial court's decision to declare a mistrial because of a deadlocked jury must be accorded great deference. *Id*. at 213, 219-220, citing *Arizona v Washington*, 434 US 497, 510; 98 S Ct 824; 54 L Ed 2d 717 (1978). "The issue is not whether this Court would have found manifest necessity, but whether the trial court *abused its discretion* in finding manifest necessity." *Id*. at 220. A reviewing court will generally defer to the trial court's determination that the jury is deadlocked because that court is in the best position to assess all factors that might affect whether the jury would be able to reach a verdict on further deliberation. *Renico v Lett*, 559 US 766, 772, 774; 130 S Ct 1855; 176 L Ed 2d 678 (2010).

## C. ANALYSIS

The United States and Michigan Constitutions prohibit placing a defendant twice in jeopardy for a single offense. US Const, Am V; Const 1963, art 1, § 15; *Ream*, 481 Mich at 227. The state and federal constitutional guarantees are substantially identical and should be similarly construed. *People v Davis*, 472 Mich 156, 161; 695 NW2d 45 (2005). The Double Jeopardy Clause precludes the prosecution from making repeated attempts to convict a defendant for the same offense. *Lett*, 466 Mich at 214. Once jeopardy has attached, the accused has a valuable right in having his or her trial concluded by the jury sworn to hear the case. *Id*. at 214-215.

Generally, jeopardy attaches in a jury trial once the jury is impaneled and sworn. *People v Mehall*, 454 Mich 1, 4; 557 NW2d 110 (1997). Once jeopardy attaches, the defendant has a constitutional right to have his case completed and decided by that tribunal. *People v Henry*, 248 Mich App 313, 318; 639 NW2d 285 (2001). "If the trial is concluded prematurely, a retrial for that offense is prohibited unless the defendant consented to the interruption or a mistrial was declared because of a manifest necessity." *Mehall*, 454 Mich at 4. A jury's inability to reach a unanimous verdict is one circumstance that constitutes a manifest necessity permitting retrial. *Id*. Indeed, a "hung jury" is the "prototypical example" of a situation when the "manifest necessity" standard is satisfied with respect to granting a mistrial and permitting retrial. *Lett*, 466 Mich at 217, citing *Oregon v Kennedy*, 456 US 667, 672; 102 S Ct 2083; 72 L Ed 2d 416 (1982). "Necessarily intertwined with the constitutional [double jeopardy] issue . . . is the threshold issue whether the trial court properly declared a mistrial." *Id*. at 213.

Defendant's first jury trial began with jury selection on December 11, 2012, and continued for the next three days with the attorney's opening statements, the testimony of witnesses, the attorney's closing arguments, and the trial court's instructions to the jury. The jury began their deliberations on December 13, 2012, at approximately 3:48 p.m. After deliberating that afternoon without having reached a verdict, the trial court excused the jury for the day at approximately 5:37 p.m. It ordered them to return the next morning at 9:00 a.m. to continue their deliberations. The record reflects that the jury continued to deliberate on December 14, 2012. The jury returned to the courtroom at 11:58 a.m. for the trial court to respond to two communications it had received from the jurors. The record shows that the jury was, as of that moment, unable to reach a verdict. The trial court addressed the jury and responded to a request for certain testimony to be read back. The court then stated it had received a note within the last fifteen minutes that read, "Can't agree, no one willing to change their verdict . . . ." After cautioning the jury against revealing "how your voting stands," the trial court read a detailed "deadlocked jury" instruction and asked the jury to continue deliberating

after they had lunch.  Neither the prosecution nor defense counsel expressed an objection to the deadlocked jury instruction in response to the trial court's invitation to do so.

After their lunch break and further deliberations, the trial court received another communication from the jury.  The jury returned to the courtroom at approximately 2:59 p.m., and the trial court again addressed them:

> Members of the jury, the Court has received your most recent communication and it reads as follows: "We are unable to reach a verdict."  In light of that and considering the length of time you have spent in deliberations, and the earlier instruction that the Court gave to you after you initially reported that you were unable to reach a verdict, I do hereby declare a mistrial in this case. I thank you, very much, for your jury service.  This jury is discharged.

The jury was discharged without any further remark appearing on the record.  Defense counsel did not object or further comment in response to the trial court's decision to declare a mistrial due to the jury's inability to reach a unanimous verdict.

Defendant argues that the trial court abused its discretion by not considering reasonable alternatives before *sua sponte* declaring a mistrial and that the court should have made findings on the record showing that no reasonable alternative to declaring a mistrial existed.  This argument is without merit as neither our Supreme Court nor the United States Supreme Court has ever required that a trial court follow a particular procedure, consider alternatives to a mistrial, or make record findings before declaring a mistrial on the basis that a jury is unable to reach a unanimous verdict.  See *Lett*, 466 Mich at 221 (footnote omitted) ("[T]his Court has never required an examination of alternatives before a trial judge declares a mistrial on the basis of jury deadlock; nor have we ever required that the judge conduct a "manifest necessity" hearing or make findings on the record.").  And, the United States Supreme Court has opined:

> We have expressly declined to require the "mechanical application" of any "rigid formula" when trial judges decide whether jury deadlock warrants a mistrial.  We have also explicitly held that a trial judge declaring a mistrial is not required to make explicit findings of " 'manifest necessity' " nor to "articulate on the record all the factors which informed the deliberate exercise of his discretion." And we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse.  [*Renico*, 559 US at 775 (citations omitted).]

There is nothing in this record to suggest that the trial court abused its broad discretion in determining that manifest necessity required the declaration of a mistrial because the jury was unable to reach a unanimous verdict in the case.  The jury deliberated for almost two hours the first afternoon after receiving the trial court's final instructions.  The next morning, the jury continued deliberating for approximately another three hours, from approximately 9:00 a.m. to 11:58 a.m., before advising the trial court that it was having difficulty reaching a verdict because

the members of the jury "[c]an't agree, no one willing to change their verdict." The trial court then specifically encouraged the jury to attempt to reach a unanimous verdict by reading them the "deadlocked jury" instruction and requiring the jury to continue deliberations. After further deliberations, the jury again indicated that it was "unable to reach a verdict." The trial court is in the best position to assess all factors that might affect whether the jury would be able to reach a verdict on further deliberation. *Renico*, 559 US at 774. Under these circumstances, with no objection by either party, the trial court's declaration of a mistrial in defendant's first trial was a proper exercise of judicial discretion. As in *Lett*, 466 Mich at 223, "manifest necessity for the jury's discharge existed, and defendant's retrial did not constitute a constitutionally impermissible successive prosecution."

## IV. SENTENCING ISSUES

Defendant next argues that the trial court erred by scoring offense variable (OV) 10 at 15 points because "predatory conduct" was not involved and also erred by scoring OV 14 at 10 points because defendant was not a leader in a multiple offender situation. Because defendant timely objected to the scoring of OV 10 and OV 14 and the trial court heard and decided the objections against him, he has preserved this issue for appeal. MCL 769.34(10); MCR 6.429(C); *People v Jones*, 297 Mich App 80, 83; 823 NW2d 312 (2012).

## A. STANDARD OF REVIEW

Our review of a sentence imposed under the statutory guidelines is limited to determining whether the sentence was imposed within the appropriate guidelines range and, if not, whether the trial court based its departure from the recommended range upon an articulated substantial and compelling reason. MCL 769.34(2), (3), (10); *People v Babcock*, 469 Mich 247, 272-273; 666 NW2d 231 (2003); *People v Malinowski*, 301 Mich App 182, 185; 835 NW2d 468 (2013). With respect to any factual findings necessary, we review the trial court's determinations for clear error and for whether they are supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

## B. ANALYSIS

The preponderance of the evidence in the record supports the trial court's scoring of 15 points under OV 10 for predatory conduct in the exploitation of a vulnerable victim, MCL 777.40(1)(a), as well as the trial court's determination that defendant was a leader in a multiple-offender situation, MCL 777.44(1)(a). Thus, the trial court did not clearly err when it assessed 10 points for OV 14 and 15 points for OV 10. *Hardy*, 494 Mich at 438. Because defendant's sentences were within the recommended range of appropriately scored sentencing guidelines, we must affirm those sentences. MCL 769.34(10); *Babcock*, 469 Mich at 261, 272.

OV 10 of the sentencing guidelines addresses the exploitation of a vulnerable victim. MCL 777.40(1). Points are assessed under this OV when exploitive conduct was directed against a vulnerable victim and the vulnerability was readily apparent, in that the victim was susceptible to injury, physical restraint, persuasion or temptation. MCL 777.40(3)(c); *People v*

*Cannon*, 481 Mich 152, 157-158; 749 NW2d 257 (2008). Under OV 10, a court must assess 15 points if predatory conduct was involved. MCL 777.40(1)(a). "Predatory conduct" is defined as "preoffense conduct directed at a victim . . . for the primary purpose of victimization." MCL 777.40(3)(a). To victimize is to make a victim of someone, and a victim is a person who suffers from a destructive or injurious action. *Cannon*, 481 Mich at 161. Predatory conduct under OV 10 must be preoffense conduct that is predatory rather than purely opportunistic criminal conduct. *People v Huston*, 489 Mich 451, 462; 802 NW2d 261 (2011). Predatory conduct need not be directed at one particular or specific victim, but it must be directed at *a* victim. *Id* at 459. The timing and location of an offense—waiting until a victim is alone and isolated—is evidence of predatory conduct. *People v Kosik*, 303 Mich App 146, 160; 841 NW2d 906 (2013); *People v Witherspoon*, 257 Mich App 329, 336; 670 NW2d 434 (2003). Lying in wait while armed to rob a delivery person at an isolated location is predatory conduct. *Huston*, 489 Mich at 463.

The record contains more than ample evidence to support the trial court's scoring OV 10 at 15 points on the basis of defendant's predatory planning and participation in the exploitation of a vulnerable victim. See *Huston*, 489 Mich at 459-468. Both Anteyon and Jones testified that defendant helped select a suitable location for the planned crime: the empty house with no electricity on a dead-end street. Other testimony confirmed that there was no power at the house and that it was dark. Once the victim arrived with the large, cumbersome pizza order, defendant and his cohorts surrounded the victim while armed with what appeared to be a real gun. Thus, the record shows that defendant engaged in predatory conduct by planning and implementing the crime at the abandoned house and by lying in wait at the isolated, dark location to victimize the pizza delivery person. This evidence supported the trial court's finding that "the conduct, involved by the defendants in this case constituted predatory conduct; that is, it was pre-offense conduct designed to lure the victim to this location of the abandoned home where they then, on the pretext of paying him, lured him in to a dark and abandoned home where he was jumped and robbed." The trial court properly scored 15 points for OV 10 on the basis of exploitation of a vulnerable victim involving predatory conduct. MCL 777.40(1)(a).

Offense variable 14 of the sentencing guidelines addresses the offender's role in the offense. MCL 777.44(1); *People v Gibbs*, 299 Mich App 473, 493; 830 NW2d 821 (2013). "The entire criminal transaction should be considered when scoring this variable." MCL 777.44(2)(a); *People v Lockett*, 295 Mich App 165, 184; 814 NW2d 295 (2012). A court must assess 10 points where "the offender was a leader in a multiple offender situation." MCL 777.44(1)(a).

A "multiple offender situation" is one where more than one person-- up to several or many persons-- participates in a violation of the law. *People v Jones*, 299 Mich App 284, 287; 829 NW2d 350 (2013), vacated in part on other grounds 494 Mich 880 (2013). A "leader" is a person who acts as a "'guiding or directing head' of a group." *Id.*, quoting *Random House Webster's College Dictionary* (1997).

While defendant argues that the trial court erred by assessing 10 points for OV 14, we find that a preponderance of evidence in the record supports the trial court's scoring. *Hardy*, 494 Mich at 438. There was testimony that defendant paid Smith's travel expenses from Chicago to Dowagiac. Both Anteyon and Jones testified that it was defendant who first expressed the idea of committing an armed robbery when defendant told them he had done "home delivery

robberies" of pizza delivery men in Wisconsin. When Jones protested that he "didn't come out here for that," defendant refused to take no for an answer and insisted that "we need to get this money" for them to return to Chicago. Rolandis also testified he heard defendant suggest a robbery, but that he declined to participate. Testimony showed it was defendant who selected Pizza Hut and directed a female friend to place the false order for him, giving her the address to the abandoned house where the crime was to take place. Defendant initiated the robbery by signaling with the words, "Dad, the pizza man here [sic]." Defendant also directed the group to call him "Pistol," and it was he who held the BB gun to the victim's face during the robbery. On this evidence, the trial court did not clearly err by assessing 10 points for OV 14. MCL 777.44(1)(a).

In summary, the preponderance of the evidence in the record supports the trial court's scoring of 15 points for OV 10 and 10 points for OV 14.[2] *Hardy*, 494 Mich at 438. Because defendant's sentences were within the recommended range of appropriately scored sentencing guidelines, we must affirm those sentences. MCL 769.34(10); *Babcock*, 469 Mich at 261, 272.

We affirm all defendant's convictions and sentences except that for carrying a dangerous weapon with unlawful intent, MCL 750.226, which we vacate. We remand for entry of an amended judgment of sentence consistent with this opinion; we do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Michael J. Riordan
/s/ Kurtis T. Wilder

---

[2] In a footnote, defendant asserts as an "aside" that OV 2, MCL 777.22, was erroneously scored. Defendant has abandoned this claim by merely announcing his position without citation to authority and by expecting this Court to discover and rationalize the basis for his claim. *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001). Defendant's failure to properly address the merits of his assertion of error constitutes abandonment of this claim. *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004).