*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

HARLYN CHRISTOPHER SHOOK, II,

        Defendant-Appellant.

UNPUBLISHED
March 3, 2022

No. 355470
Antrim Circuit Court
LC No. 2019-004993-FC

Before: REDFORD, P.J., and K. F. KELLY and LETICA, JJ.

PER CURIAM.

Defendant appeals by delayed leave granted[1] his sentence of 24 to 60 months' imprisonment for aggravated stalking, MCL 750.411i. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

The victim, the mother of two children, met defendant when she was in fifth grade, but lost contact with him in eighth grade. As adults, the two became reacquainted when he messaged her through Facebook in 2017. Defendant lived in Colorado at the time. In September 2017, defendant moved in with the victim in Mancelona, Michigan. In late October 2017, the victim saw a text message that defendant sent to an ex-girlfriend. Defendant did not think it was wrong to send the message, but the victim questioned how defendant would feel if she had received such a message. The discussion turned into a screaming match between the two of them in her vehicle. Although defendant was driving, the argument turned physical. The victim exited the vehicle. Defendant attempted to chase the victim down with her car and run her over. To avoid being struck, the victim ran into the woods. Defendant parked the car and pursued her. The victim was unsure if she tripped or if defendant struck her. However, she found herself on the ground with defendant

---

[1] *People v Shook, II*, unpublished order of the Court of Appeals, entered March 4, 2021 (Docket No. 355470).

on top of her and choking her with his hands.  The victim could not breathe and could hardly speak.  She believed that she was going to die and her concerns about defendant continued.

On March 12, 2018, defendant engaged in similar conduct.  The victim was given a ride home from a work staff meeting by a female coworker.  A short time later, defendant entered the home and was angry that the victim had received a ride home.  He insisted that he observed a man drop the victim off at home.  This belief angered defendant.  First, he yelled at the victim and slammed doors in the home.  Then, he chased the victim, and a physical altercation occurred.  Specifically, defendant pushed the victim onto the bed, hit her a few times, and pulled her hair.  Defendant tried to sexually assault the victim, but she was able to kick him off of her.  The victim feared that the defendant was going to kill her.  The victim went to work.  At that time, a coworker asked the victim about bruises on the victim's face.  The victim also had a lump on the back of her head, and she was "sore all over."  By May 2018, the relationship between the couple was over.

The victim testified concerning these two incidents and recounted three more when defendant pleaded guilty to one count of domestic violence, third offense, MCL 750.81(5).  On August 16, 2018, he was sentenced to 16 months to 5 years' imprisonment for the domestic violence.

On April 26, 2018, the victim obtained a personal protection order (PPO) against defendant.[2]  This PPO precluded defendant from having any contact with the victim for one year.  Nonetheless, in August or September of 2018, defendant mailed a letter from Jackson prison to the victim's children.  The victim's children were only six and four years old.  The victim recognized defendant's handwriting and his signature on the letter and feared that her daughter would try to read it.  The victim threw this letter out.  In November 2018, the victim received a second letter mailed by defendant to her from Jackson prison.  The victim did not read this letter, but gave it to the police.  The letter made the victim angry because she had "moved on" and was happy.  After receiving the letter, the victim was concerned for her safety.  She testified she feared that defendant would not be "out of my life for good, even though he was locked up."  The victim also noted that if defendant could get to her from prison, he would not be stopped from "getting" to her upon his release.

Indeed, despite changing her phone number on multiple occasions, the victim received approximately 15 telephone calls from defendant although she never gave him her contact information.  The victim generally did not answer these calls, but defendant left messages.  These messages consisted of a recording that the call was from an inmate and the victim then recognized defendant's voice.  The victim presented a photograph of her call logs from April 2019, showing they occurred between April 17, 2019, and April 29, 2019.  The victim did not know how defendant acquired her phone number and was terrified because he received the phone number without her

---

[2] On April 27, 2018, a corrections officer with the Antrim County Sheriff's Department served a copy of a personal protection order on defendant at the county jail.  The officer had defendant sign and date the paperwork, and the proof of service was returned to the court.

giving it to him. The victim had been selective about who received her phone number, and she felt like someone was following her at defendant's request.

A police detective instructed the victim to try to record any future call and have defendant state his name. Consequently, the victim answered one phone call in late April 2019, and her fiancé attempted to record it. During this call, the victim instructed defendant to stop calling her. The victim was unaware of any further attempt by defendant to contact her.[3]

At the conclusion of the victim's testimony, the district court[4] determined that there was probable cause to believe that defendant committed aggravated stalking in violation of the PPO by engaging in a willful course of conduct to intimidate and harass the victim. Defense counsel objected to consideration of the letter mailed to the victim for purposes of aggravated stalking. He alleged that the letter was the subject of a PPO violation for which defendant was held in contempt of court and served 93 days in jail. It was defendant's intent to prepare a brief contending that the evidence of the mailed letter to support aggravated stalking constituted a due process, double jeopardy violation.[5] The district court noted the objection and overruled it.

Thereafter, defendant was arraigned in circuit court and entered a not-guilty plea. The prosecution filed a written notice of its intent to enhance defendant's sentence as a fourth habitual offender, MCL 769.12. Defendant declined an offer to plead guilty to the aggravated stalking charge in exchange for the dismissal of the habitual offender enhancement.

And defendant moved to dismiss the charge of aggravated stalking. He alleged that the November 18, 2018 letter mailed to the victim could not serve as a ground for aggravated stalking because it would violate double jeopardy's prohibition against a second prosecution for the same offense after conviction or multiple punishments for the same offense. Specifically, he asserted that to demonstrate aggravated stalking, the prosecution had to prove the alleged stalking violated a court's order. Because the letter mailed to the victim served as the basis for contempt and defendant was punished with a 93-day jail sentence, he alleged that this aggravated-stalking prosecution violated the double-jeopardy prohibition. Alternatively, defendant asserted that consideration of a PPO violation for purposes of aggravated stalking violated "due process mandates."

The prosecutor opposed the motion, noting that defendant was previously charged with five counts of domestic violence, third offense, and notice of the enhancement as a habitual offender, third offense, MCL 769.11, for his acts committed against the victim between

---

[3] In December 2018, the victim moved from Antrim to Kalkaska County. All of the calls made by defendant occurred when the victim resided in Kalkaska County. However, an officer subsequently investigated and concluded that the victim resided within one mile of Antrim County, declining to provide her exact address.

[4] The prosecutor apprised the district court judge that it had another witness to testify. But, the court interjected, and the additional witness was never called.

[5] Defendant also challenged venue and the timeliness of the preliminary examination, but did not raise the rejection of these issues in his application to this Court.

October 2017, and April 2018. On July 16, 2018, defendant pleaded guilty to one count of domestic violence, third offense, in exchange for the dismissal of the four other counts and the habitual offender notice. Although defendant sought to exclude from evidence all acts against the victim that may have resulted in a conviction for domestic violence, third offense, and the contempt violation, the prosecutor alleged that the evidence was pertinent to establish aggravated stalking and did not violate double jeopardy, citing *People v White*, 212 Mich App 298; 536 NW2d 876 (1995). The trial court noted that contempt was a civil matter, although the punishment imposed consisted of 93 days in jail. The trial court adopted the rationale proffered by the prosecution and denied defendant's motion to dismiss premised on double jeopardy.

Following the trial court's ruling, the parties engaged in plea discussions. The prosecutor agreed to dismiss the habitual fourth enhancement in exchange for defendant's guilty plea to aggravated stalking, a five-year felony. To support the plea to aggravated stalking, defendant admitted to engaging in repeated or continuous harassment of the victim, his ex-girlfriend. Specifically, he testified that he began to date the victim in September 2017, and they started living together in October 2017. Near the end of October 2017, the couple were driving together in a vehicle when defendant pulled over and hit the victim. His abusive conduct continued between October 2017 and April 2018, when he would strike the victim against her will. As a result of the victim's report of the abuse, defendant was charged with multiple counts of domestic violence, third offense. Further, the victim obtained a PPO against defendant effective through April 27, 2019, as a result of his abuse. Defendant admitted that he pleaded guilty to one count of domestic violence, third offense, and was sentenced to prison. Nonetheless, defendant sent a letter to the victim and in April 2019, made at least thirteen phone calls to the victim in violation of the PPO. Defendant further agreed that the victim felt terrorized, frightened, intimidated, threatened, harassed, or molested by his activities. The trial court accepted the plea as knowingly, understandingly, and voluntarily given.

For the aggravated stalking conviction, the court sentenced defendant to 24 to 60 months' imprisonment to be served consecutive to his domestic violence, third offense, sentence.

On August 19, 2020, defendant filed a motion for resentencing. He alleged that offense variable (OV) 3 and OV 9 were improperly scored because they incorporated the abuse underlying the domestic-violence conviction, instead of the sentencing offense of aggravated stalking, in violation of double jeopardy principles, his sentence was unreasonable and disproportionate, and his risk factors for COVID warranted resentencing. The prosecutor opposed the motion for resentencing, contending that defendant's prior failure to object to the scoring of OVs 3 and 9 resulted in the forfeiture of the issue. In any event, defendant's physical abuse of the victim and the letter written to her children satisfied the OV scores. Because the trial court previously rejected the double jeopardy argument, the prosecutor alleged a request for resentencing was barred by collateral estoppel. Finally, the prosecutor submitted that a request for resentencing or release violated the governor's right to commute sentences.

On September 21, 2020, the trial court heard oral argument. The court then ruled that its prior rejection of double jeopardy principles was proper, OVs 3 and 9 were properly scored, and the concentration of COVID in prison did not warrant resentencing when COVID was "everywhere" and presented a global pandemic. Finally, the trial court found that defendant's sentence was proportionate. We granted defendant's delayed application for leave to appeal.

## II. DOUBLE JEOPARDY

Defendant first alleges that the scoring of OVs 3 and 9 violated double jeopardy. We disagree.

A double jeopardy challenge presents a question of constitutional law reviewed de novo. *People v Ream*, 481 Mich 223, 226; 750 NW2d 536 (2008).[6] The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" US Const, Am V. Const 1963, art 1, § 15 provides that "[n]o person shall be subject for the same offense to be twice put in jeopardy." The Double Jeopardy Clause precludes the prosecution from making repeated attempts to convict a defendant for the same offense. *People v Ackah-Essien*, 311 Mich App 13, 31; 874 NW2d 172 (2015).

> The prohibition against double jeopardy protects individuals in three ways: "(1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense." The first two protections comprise the "successive prosecutions" strand of double jeopardy, while the third protection is known as the "multiple punishments" strand.

> The multiple punishments strand of double jeopardy "is designed to ensure that courts confine their sentences to the limits established by the Legislature" and therefore acts as a "restraint on the prosecutor and the Courts." The multiple punishments strand is not violated "[w]here 'a legislature specifically authorizes cumulative punishment under two statutes . . . .' " Conversely, where the Legislature expresses a clear intention in the plain language of a statute to prohibit multiple punishments, it will be a violation of the multiple punishments strand for a trial court to cumulatively punish a defendant for both offenses in a single trial. "Thus, the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed."

> The Legislature, however, does not always clearly indicate its intent with regard to the permissibility of multiple punishments. When legislative intent is not clear, Michigan courts apply the "abstract legal elements" test articulated in *Ream* to ascertain whether the Legislature intended to classify two offenses as the "same offense" for double jeopardy purposes. This test focuses on the statutory elements of the offense to determine whether the Legislature intended for multiple punishments. Under the abstract legal elements test, it is not a violation of double jeopardy to convict a defendant of multiple offenses if "each of the offenses for which defendant was convicted has an element that the other does not . . . ." This means that, under the *Ream* test, two offenses will only be considered the "same

---

[6] Defendant preserved this issue for appellate review by objecting in the trial court. *People v Ackah-Essien*, 311 Mich App 13, 30; 874 NW2d 172 (2015).

offense" where it is impossible to commit the greater offense without also committing the lesser offense.

> In sum, when considering whether two offenses are the "same offense" in the context of the multiple punishments strand of double jeopardy, we must first determine whether the statutory language evinces a legislative intent with regard to the permissibility of multiple punishments. If the legislative intent is clear, courts are required to abide by this intent. If, however, the legislative intent is not clear, courts must then apply the abstract legal elements test articulated in *Ream* to discern legislative intent. [*People v Miller*, 498 Mich 13, 17-19, 869 NW2d 204 (2015) (footnotes omitted).][7]

"[A] prosecution on charges dismissed pursuant to a plea agreement does not violate the Double Jeopardy Clause where the newly charged offense is a different offense for double jeopardy purposes than the crime to which the defendant has pleaded guilty." *People v Mezy*, 453 Mich 269, 276, 286; 551 NW2d 389 (1996) (Opinions by WEAVER and BRICKLEY, JJ.). "There is no violation of double jeopardy protections if one crime is complete before the other takes place, even if the offenses share common elements or one constitutes a lesser offense of the other." *People v Lugo*, 214 Mich App 699, 708; 542 NW2d 921 (1995) (citation omitted).

Although defendant raised the issue of the OV scoring in the context of double jeopardy, he presented no significant argument or citation to legal authority in support. For example, defendant failed to address the three different scenarios that invoke double jeopardy protections and the protection at issue in this case. He further failed to cite authority to support his position. An appellant's failure to support the merits of a claim of error with citation to authority constitutes abandonment of the issue. *People v Miller*, 326 Mich App 719, 739; 929 NW2d 821 (2019).

Nonetheless, in *People v Gibson*, 219 Mich App 530, 535; 557 NW2d 141 (1996),[8] this Court rejected the contention that the scoring of the OVs may constitute a violation of double jeopardy:

> In *People v Milbourn*, 435 Mich 630, 655-656; 461 NW2d 1 (1990), our Supreme Court stated that the guidelines are merely a tool for gauging the seriousness of a particular offense and offender in order to limit the disparity in sentences received by similarly situated defendants. In other words, according to

---

[7] Our Supreme Court clarified that it adopted the test of *Blockburger v United States*, 284 US 299, 304; 52 S Ct 180; 76 L Ed 306 (1932), and it applies to both successive prosecutions and multiple punishments. *Ream*, 481 Mich at 234, 239-240. The *Blockburger* test "focuses on the statutory elements of the offense" and if each offense requires proof of an element that the other does not, the test is satisfied; if not, double jeopardy bars additional punishment. See *Ream*, 481 Mich at 227-228.

[8] Although *Gibson* was decided when the judicial sentencing guidelines were in effect, the application of the now-advisory legislative sentencing guidelines, see *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), does not alter *Gibson*'s application.

the Court in *Milbourn*, the guidelines are "a useful tool in carrying out the legislative scheme of properly grading the seriousness and harmfulness of a given crime and given offender within the legislatively authorized range of punishments." *Id*. at 657-658. Because the guidelines are merely a tool for assessing the proper punishment, they are not, in and of themselves, a form of punishment.

Accordingly, we conclude that the scoring of the guidelines does not implicate double jeopardy issues. [*Id*.]

As the *Gibson* Court aptly noted, the guidelines are not a form of punishment, but merely a tool to determine the appropriate punishment. Accordingly, defendant's challenge[9] to the scoring of the offense variables premised on double jeopardy is without merit.[10]

---

[9] Although defendant did not identify which of the three double jeopardy protections was violated, defendant noted that the prosecutor argued that it could consider any past domestic violence or stalking behavior because all of those events were not charged, and therefore, double jeopardy would not be implicated. Defendant contends that the prosecutor's position is erroneous because prior domestic violence is not an element of aggravated stalking, and the only reason the prosecutor was able to charge aggravated stalking was because of a PPO order in effect, not due to a prior stalking conviction. Defendant's position ignores the procedural posture of this case. Defendant pleaded guilty to aggravated stalking. He did not seek to withdraw his plea to aggravated stalking and allege that a double jeopardy violation occurred in light of the prior conviction for domestic violence, third offense. Rather, defendant's statement of questions presented asserted a double jeopardy violation occurred in light of the *scoring* of the OVs. The answer to the question posed by defendant is a simple "no" because the calculation of the guidelines is not a form of punishment. *Gibson*, 219 Mich App at 535.

[10] Even if defendant had contended that double jeopardy protections were violated because the sentence for aggravated stalking presented a multiple punishment for the same conduct as the conviction for domestic violence, third offense, the aggravated stalking statute does not prohibit such punishment. MCL 750.411i(6) provides: "A criminal penalty provided for under this section may be imposed in addition to any penalty that may be imposed for any other criminal offense arising from the same conduct or for contempt of court arising from the same conduct." In light of this subsection, the Legislature intended to impose multiple punishments for defendant's convictions for aggravated stalking, domestic violence, and criminal contempt. See *People v Coones*, 216 Mich App 721, 728; 550 NW2d 600 (1996). Moreover, in *White*, 212 Mich App at 306-307, this Court rejected the assertion that stalking was a continuous act or offense for which one could only receive one punishment and allowed separate convictions for misdemeanor and felony stalking arising from distinct occurrences or episodes.

### III. OFFENSE VARIABLES

Defendant also submitted that OVs 3 and 9 were improperly scored. We disagree.

To preserve a challenge to an OV score, a defendant must raise the issue at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed with this Court. MCL 769.34(10); *People v Jackson*, 487 Mich 783, 795-796; 790 NW2d 340 (2010). Defendant preserved these OV challenges in his motion for resentencing.

"A trial court's factual determinations at sentencing are reviewed for clear error and need only be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to warrant the assessment of points under the pertinent OVs and [prior record variables] PRVs is a question of statutory interpretation, which [the appellate court] reviews de novo." *People v Carter*, 503 Mich 221, 226; 931 NW2d 566 (2019). "[T]he offense variables are scored by reference only to the sentencing offense, except where specifically provided otherwise." *People v McGraw*, 484 Mich 120, 129; 771 NW2d 655 (2009).

OV 3 addresses "physical injury to a victim." MCL 777.33(1). When addressing OV 3, the focus is not on the defendant's actions, but the victim's injuries. See *People v Chaney*, 327 Mich App 586, 588; 935 NW2d 66 (2019). OV 3 should be scored five points when "[b]odily injury not requiring medical treatment occurred to a victim." MCL 777.33(1)(e); *People v Rosa*, 322 Mich App 726, 745; 913 NW2d 392 (2018).

Here, the sentencing offense was aggravated stalking. Aggravated stalking consists of the crime of stalking and the presence of an aggravating circumstance. *People v Threatt*, 254 Mich App 504, 504; 657 NW2d 819 (2002). Stalking is defined as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." MCL 750.411i(1)(e). MCL 750.411i(2) addresses aggravated stalking and provides:

> (2) An individual who engages in stalking is guilty of aggravated stalking if the violation involves any of the following circumstances:
>
> (a) At least 1 of the actions constituting the offense is in violation of a restraining order and the individual has received actual notice of that restraining order or at least 1 of the actions is in violation of an injunction or preliminary injunction.
>
> (b) At least 1 of the actions constituting the offense is in violation of a condition of probation, a condition of parole, a condition of pretrial release, or a condition of release on bond pending appeal.
>
> (c) The course of conduct includes the making of 1 or more credible threats against the victim, a member of the victim's family, or another individual living in the same household as the victim.
>
> (d) The individual has been previously convicted of a violation of this section or section 411h.

-8-

For purposes of aggravated stalking, defendant contends that he was unable to cause physical harm to the victim because he was incarcerated and any stalking behavior was limited to phone calls and letters. Defendant's position ignores the definition of the term "stalking" which includes "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." MCL 750.411i(1)(e). "Molest" is defined as "to make unwanted or improper sexual advances towards" or "to annoy, disturb, or persecute . . . especially with hostile intent or *injurious effect*." Merriam Webster Dictionary (2019) (emphasis added). Thus, the offense of aggravated stalking encompasses physical harm to the victim in the course of the stalking behavior.

Further, the victim testified to physical assaults by defendant upon her. In late October 2017, the victim argued with defendant as the couple drove in her vehicle. A physical altercation occurred in the car. The victim fled the vehicle, and defendant attempted to run her over with the car. The victim ran into the woods where defendant pursued her on foot. Defendant was able to choke the victim around the throat to the point that she could not breathe. In March 2018, defendant was angry with the victim for getting a ride home from a coworker, pursued her around the home and attempted to sexually assault the victim. In the course of that incident, the victim suffered bruises on her face and a lump to the back of her head. Although the victim testified to the assaults and the manifested injuries, she did not testify about seeking medical treatment.[11] Under the circumstances, the trial court did not clearly err in finding a preponderance of the evidence to support the five-point score for OV 3.

OV 9 addresses number of victims. MCL 777.39. OV 9 is scored at 10 points where "2 to 9 victims who were placed in danger of physical injury or death." MCL 777.39(1)(c). Each person placed in danger of physical injury or death may be considered. *People v Walden*, 319 Mich App 344, 349; 901 NW2d 142 (2017). When multiple witnesses are present at the scene of a robbery or assault, they may be classified as victims when placed in danger. *Id*. In the present case, the victim reported that defendant would become angry and then physically assault her. In recounting the abuse to the police, the victim advised that defendant came to her place of employment where she cared for a mentally challenged adult. Because defendant was not supposed to be there, the victim told defendant that he had to leave. Defendant promised to leave if the victim opened the door and gave him a kiss. After the victim acceded, defendant did not leave. Instead, he became upset with the victim and punched her in the nose. Defendant's nine-year old son was also present for another incident. Further, the victim shared custody of her two children with their biological father, and they lived with her 50% of the time. The police report characterized the three minor children as victims. In light of the evidence of defendant's volatile and assaultive behavior, his pursuit of the victim through the family home while enraged, his appearance at her place of employment while the victim cared for a vulnerable adult, the presence of defendant's son, and the

---

[11] Defendant did not present any evidence from the domestic violence, third offense, conviction to demonstrate that these acts were the subject of that conviction.

victim's custody of her children, we cannot conclude that the trial court clearly erred in its determination to score OV 9 at 10 points.[12]

Finally, although not raised in the statement of questions presented, defendant contends that the sentence was not reasonable and proportionate, particularly when the OV 3 and 9 scores are excluded. We disagree.

The appellate court reviews the proportionality or reasonableness of a sentence under the abuse of discretion standard of review. *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017); *Milbourn*, 435 Mich at 636. An abuse of discretion occurs where a trial court's sentencing decision "falls outside the range of reasonable and principled outcomes." *People v Everett*, 318 Mich App 511, 516; 899 NW2d 94 (2017).

The principle of proportionality "requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Steanhouse*, 500 Mich at 459. When a trial court imposes a sentence within the minimum sentencing range, the only factors for determining whether resentencing is required due to a disproportionate sentence are inaccurate information relied upon in determining the sentence and error in scoring the sentencing guidelines. See MCL 769.34(10); *People v Schrauben*, 314 Mich App 181, 196, n 1; 886 NW2d 173 (2016). Defendant did not demonstrate a scoring error or inaccurate information served as the basis of his sentence.

The minimum sentencing guidelines were scored at 14 to 29 months' imprisonment. The trial court noted that defendant acquired only one major violation for getting a tattoo while incarcerated. To his credit, defendant obtained his GED, attended AA meetings twice a week, served as the representative for his prison block, and worked in the laundry. The trial court balanced these factors against his prior criminal history, assaultive behaviors, and the need to protect the victim. The trial court concluded that a sentence within the guidelines was appropriate under the circumstances and imposed a sentence of 24 to 60 months' imprisonment.

Consequently, there is a presumption of proportionality which can only be overcome if defendant demonstrates something unusual about the circumstances of the case which renders the sentence disproportionate. *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). Defendant failed to address the circumstances of this case that would make the sentence imposed disproportionate and unreasonable, and we concluded that the trial court did not abuse its discretion.

Affirmed.

/s/ James Robert Redford
/s/ Kirsten Frank Kelly
/s/ Anica Letica

---

[12] In any event, defendant would not be entitled to resentencing unless he prevailed on both of his OV challenges. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006) ("Where a scoring error does not alter the appropriate guidelines range, resentencing is not required.").