*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

HOWARD BENJAMIN LOWRY, SR,

        Defendant-Appellant.

UNPUBLISHED
November 14, 2019

No. 339794
Wayne Circuit Court
LC No. 17-001839-01-FC

Before: M. J. KELLY, P.J., and FORT HOOD and SWARTZLE, JJ.

PER CURIAM.

Defendant was tried twice on assault and firearms charges. The first trial ended in a
mistrial when the jury was unable to reach a unanimous verdict. The prosecutor retried
defendant before a second jury, which convicted him of three felonies. On appeal, defendant
argues that his retrial violated constitutional protections against double jeopardy, that the
evidence was insufficient to convict him, and that the trial court erroneously scored several
offense variables. Because defendant's retrial did not violate double-jeopardy protections and
the trial court's erroneous scoring of one offense variable does not alter the applicable
sentencing-guidelines range, we affirm defendant's convictions and sentences.

## I. BACKGROUND

At his Father's Day celebration, defendant had a dispute with one of his sons, HLJ.
Defendant's other son, Marcus Ross, intervened when defendant became physically aggressive
with HLJ. Defendant ordered Ross to leave the home, pointed a shotgun at Ross, and shot him.
Witnesses presented conflicting testimony regarding whether defendant shot Ross accidentally or
intentionally. As a result of the shooting, Ross spent eight days in the hospital with abdominal
injuries and a detached thumb.

At defendant's first trial, during a lunch break, a juror overheard the prosecutor speaking
about the case. Before the trial court provided final instructions to the jury, the prosecutor
informed the trial court regarding what happened. The prosecutor stated that, during lunch, she
had a conversation in which she was discussing what had occurred during the trial. The
prosecutor stated that a juror peered at her from around a pillar to inform her that he was present,

and she stopped speaking about the case. The prosecutor reported that no other jurors were present, the juror was not displaying his juror badge, and the juror was sitting "kind of behind a pillar" where she could not see him. The juror confirmed the prosecutor's report, but admitted that he did not hear the prosecutor speak about anything other than what the jury heard and saw while in the courtroom. The juror disclosed that he had told other jurors that he heard the prosecutor's conversation but that he did not disclose the details to them.

The trial court questioned each of the other jurors, who confirmed that they knew that a juror had heard the prosecutor speak about the case, did not know the details, and felt that they could remain impartial. Defendant moved for a mistrial. The trial court denied the motion, but dismissed the juror who overheard the prosecutor's comments because the juror stated that he had formed an opinion about the prosecutor. The trial court concluded that the other jurors did not hear any information and could remain impartial. Several days into its deliberations, the jury informed the trial court that it could not reach a unanimous verdict despite having voted multiple times and having received the deadlocked-jury instruction. The trial court declared a mistrial based on its conclusion that there was no likelihood that the jury could reach a verdict.

The prosecutor subsequently retried defendant before a new jury. Defendant's theory at trial was that he only intended to force Ross from the home by poking him with a shotgun, and that he did not intend to do great bodily harm less than murder. The witnesses' accounts of the shooting changed over time and defendant's family members—including Ross—acknowledged that they wanted leniency and did not want to see defendant punished.

Witnesses testified that Ross had intervened upstairs at his parents' home where defendant was punching HLJ, and Ross physically restrained defendant. Defendant ordered Ross out of the house, and Ross went downstairs and was in the process of gathering his family to leave. Defendant appeared in the living room, pointing a shotgun at Ross, and Ross walked toward defendant, who pushed the gun into Ross's abdomen. Ross reported that he grabbed the barrel of the gun and defendant shot, striking Ross's thumb and his abdomen.

Ross and his fiancé testified that they were already in the process of leaving the home when defendant appeared with the shotgun. Meanwhile, defendant stated in a police interview that he was in a rage after feeling disrespected. Testimony indicated that defendant stopped in his bedroom to retrieve his shotgun while Ross was preparing to leave, and overcame the resistance of his wife in order to load the weapon, pushing her out of the way to get to the living room. Ross's fiancé testified that she had told the police that defendant said "do you want to [expletive] with me," before shooting Ross. In addition, Ross testified that defendant said, "Tell them what I did," after shooting him.

Initially, when the witnesses spoke with police, they did not claim that the shooting was accidental. Both Ross and defendant's wife admitted at trial that they had not told the police that their hands were on defendant or the gun at the time of the shooting, and Ross admitted that he told the police that he believed that defendant shot him on purpose. Ross also acknowledged that he denied at the first preliminary examination that he had grabbed the gun before defendant shot; he had said that his hand was where defendant pushed the gun into him. Ross testified that he did not want defendant to get into trouble, and that he believed in forgiveness and second chances. Defendant's wife stated that she did not want to testify and that she did not want

defendant to experience negative consequences because he was a good husband and father. Both acknowledged that they had written to the prosecutor asking for leniency for defendant.

The second jury convicted defendant of assault with intent to do great bodily harm (AWIGBH), MCL 750.84, felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. After the verdict was read, defendant refused to go to the detainment area, attempted to pull away from police officers, did not respond to the officers' commands, and had to be subdued by multiple police officers with a taser.

The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to serve concurrent prison terms of 5 to 15 years for the AWIGBH conviction and 3 to 7 years, 6 months for the felon-in-possession conviction, and to a consecutive two-year term for the felony-firearm conviction.

This appeal followed.

## II. ANALYSIS

On appeal, defendant argues that his constitutional protection against double jeopardy was abridged when he was retried, that the evidence on retrial was insufficient to convict him, and that the trial court incorrectly scored several offense variables during sentencing. Although the trial court incorrectly scored one offense variable, resentencing is not required because the error does not affect the applicable sentencing-guidelines range and defendant's sentence was within the guidelines. Defendant's remaining claims are without merit.

### A. DOUBLE JEOPARDY

Because defendant did not assert that his double-jeopardy rights were violated in the trial court, this issue is unpreserved. We review unpreserved constitutional claims for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Reversal is warranted only if the plain error "resulted in the conviction of an innocent defendant" or if the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* (cleaned up).

The Michigan Constitution and the Fifth Amendment of the United States Constitution protect a criminal defendant from being subject for the same offence to be twice put in jeopardy. US Const Am V; Const 1963, art 1, § 15. Michigan's double-jeopardy provision was intended to be "construed consistently with Michigan precedent and the Fifth Amendment." *People v Szalma*, 487 Mich 708, 715-716; 790 NW2d 662 (2010) (cleaned up). The prohibition against double jeopardy provides three related protections: "(1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense." *People v Nutt*, 469 Mich 565, 574; 677 NW2d 1 (2004) (citations omitted).

## 1. DEADLOCKED JURY

The protection against multiple prosecutions is intended to preclude repeated opportunities to obtain a conviction when the defendant has been acquitted, convicted, or pardoned for the same offense. *People v Lett*, 466 Mich 206, 213-214; 644 NW2d 743 (2002). As explained earlier, defendant was retried on the same charges after a previous trial ended in a mistrial because the jury was unable to reach a verdict. Defendant does not argue that the declaration of a mistrial was improper, but argues that his retrial after that mistrial was barred by double-jeopardy principles.

"When a mistrial is declared, retrial is permissible under double jeopardy principles where manifest necessity required the mistrial." *People v Echavarria*, 233 Mich App 356, 363; 592 NW2d 737 (1999). Manifest necessity means "the existence of sufficiently compelling circumstances that would otherwise deprive the defendant of a fair trial or make its completion impossible." *Id*. (cleaned up). It has long been established that the failure of a jury to agree on a verdict constitutes manifest necessity which allows for a retrial. *Lett*, 466 Mich at 217-218. A retrial after a mistrial caused by jury deadlock does not violate constitutional protections against double jeopardy. *People v Ackah-Essien*, 311 Mich App 13, 34-35; 874 NW2d 172 (2015). Defendant's first trial ended in a mistrial because of the jury's inability to agree on a verdict. Therefore, his second trial was not barred by double-jeopardy protections.

## 2. PROSECUTORIAL MISCONDUCT

Defendant nonetheless argues that the second trial should have been barred because the conduct of the prosecutor caused the mistrial in the first case.

A trial court should grant a mistrial only when an error occurs that is "so egregious that the prejudicial effect can be removed in no other way." *People v Gonzalez*, 193 Mich App 263, 266; 483 NW2d 458 (1992). Yet, when a defendant successfully moves for a mistrial because of intentional prosecutorial misconduct, the defendant does not waive double-jeopardy protections and a retrial may be barred. *People v Dawson*, 431 Mich 234, 253; 427 NW2d 886 (1988).

Defendant argues that the prosecutor in this case committed intentional misconduct. Defendant, an African American, argues that the prosecutor spoke about the trial in front of an African American juror in an intentional effort to remove the juror and cause a mistrial, so as to create a better chance of a conviction at a second trial. As evidence, defendant notes that the prosecutor said both that she did not see the juror and that the juror was not wearing a juror badge, and argues that it could not have been a coincidence that the prosecutor was speaking loudly in a restaurant where the juror went for lunch.

Although we agree that the prosecutor acted negligently in this case, we cannot conclude that the prosecutor's behavior was an intentional attempt to create a mistrial. The prosecutor stated that the error was unintentional, that the juror was not wearing a badge and was seated "kind of behind a pillar" where she could not see him, and that the prosecutor was alerted to the juror's presence only when the juror addressed her. To accept defendant's argument that the prosecutor intentionally spoke loudly about the case while obscuring herself behind a pillar after learning where the juror was going to have lunch, we would also have to conclude that she

anticipated that the trial court would declare a mistrial as a result, or that she foresaw that the jury would not be able to arrive at a verdict. Because the incident occurred before the case was submitted to the jury, the prosecutor would not have known whether the juror would have been selected to deliberate about the case, or would have been dismissed as an alternate. There is little beyond innuendo to show that the prosecutor's conduct was intentionally "improper and prejudicial," and was pursued for the "improper purpose" of being able to retry defendant. Accordingly, defendant's second trial was not barred by double-jeopardy protections.

## B. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that the evidence was insufficient to demonstrate that he intended serious harm to Ross, and was therefore insufficient to demonstrate that he was guilty beyond a reasonable doubt of AWIGBH.

This Court reviews de novo defendant's challenge to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. *Id*. Circumstantial evidence and reasonable inferences derived from such evidence can constitute sufficient proof of the elements of the crime. *Carines*, 460 Mich at 757. "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

In order to convict a defendant of AWIGBH, the prosecutor must demonstrate "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Stevens*, 306 Mich App 620, 628; 858 NW2d 98 (2014) (cleaned up). Critically, AWIGBH requires a specific intent "to do serious injury of an aggravated nature." *Id.*, citing *People v Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005).

The defendant's intended result is what "distinguishes the misdemeanors, simple assault and aggravated assault" from the felony of AWIGBH. *People v Van Diver*, 80 Mich App 352, 356; 263 NW2d 370 (1977). "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *Kanaan*, 278 Mich App at 622. A defendant's intent may be inferred "from his words or from the act, means, or the manner employed to commit the offense." *People v Hawkins*, 245 Mich App 439, 458; 628 NW2d 105 (2001).

Here, defendant described himself as being in a rage. His actions of physical aggressiveness with his son upstairs and his opposition to his wife in their bedroom demonstrated this rage. Further, his words to Ross before the shooting portrayed his anger and aggressiveness. Significantly, he loaded his shotgun, despite resistance, suggesting an intent to harm Ross. In short, defendant pursued Ross, loaded a shotgun, pushed it into Ross's abdomen, and discharged the weapon.

Additionally, the serious injury to Ross's abdomen and thumb after having been shot at close range was indicative of defendant's intent to cause great bodily harm. "[T]he injury actually inflicted need not be an injury specifically intended, but it can nevertheless be strongly probative of the intent to cause the requisite quantum of harm." *People v Dillard*, 303 Mich App 372, 378; 845 NW2d 518 (2013). "Injuries suffered by the victim may also be indicative of a defendant's intent," and an "intent to cause serious harm can be inferred from . . . the use of a dangerous weapon or the making of threats." *Stevens*, 306 Mich App at 629.

Importantly, there were credibility questions with the testimony of Ross and defendant's wife on the issue of defendant's intent. "We do not interfere with the jury's assessment of the weight and credibility of witnesses or the evidence." *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013). The trier of fact determines "what inferences may be fairly drawn from the evidence" and "the weight to be accorded those inferences." *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014) (cleaned up). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Gonzalez*, 468 Mich 636, 640-641; 664 NW2d 159 (2003) (cleaned up). Here, the jury evaluated the evidence and concluded that the shooting was not accidental. The evidence supported the jury's determination. The evidence supported the jury's verdict.

## C. OFFENSE VARIABLES

Defendant next argues that the trial court incorrectly assessed 10 points for OV 4, 10 points for OV 9, and 25 points for OV 19. We conclude that the trial court incorrectly scored OV 4, but correctly scored OVs 9 and 19. Because the scoring error regarding OV 4 does not change the sentencing-guideline range, resentencing is not required.

This Court reviews the trial court's factual determinations at sentencing for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*. "A defendant is entitled to be sentenced by a trial court on the basis of accurate information." *People v Francisco*, 474 Mich 82, 88; 711 NW2d 44 (2006). A trial court relies on inaccurate information when it sentences a defendant by consulting an inaccurate advisory guidelines range. *Id*. at 89 n 7. "The sentencing offense determines which offense variables are to be scored in the first place, and then the appropriate offense variables are generally to be scored on the basis of the sentencing offense." *People v Sargent*, 481 Mich 346, 348; 750 NW2d 161 (2008). The trial court's factual determinations regarding offense variables must be supported by a preponderance of the evidence. *People v Osantowski*, 481 Mich 103, 111; 748 NW2d 799 (2008).

### 1. OV 4

OV 4 considers psychological injury to a victim. MCL 777.34. The statute provides for a score of 10 points "if serious psychological injury may require professional treatment," and "the fact that treatment has not been sought is not conclusive." MCL 777.34(2). The trial court must assess zero points for OV 4 when "[n]o serious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(b). The trial court assessed 10 points for this

variable based on its finding that Ross suffered serious psychological injury. The trial court stated, "although he may not be seeking counseling, he probably should be because he was shot by his father." The parties agree that the trial court incorrectly scored OV 4 because there was no evidence of serious psychological injury to Ross. Although it would be reasonable to presume that the circumstances of Ross's shooting could create serious psychological injury, Ross did not describe serious psychological injury. "The trial court may not simply assume that someone in the victim's position would have suffered psychological harm." *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012). In this case, the trial court should have assessed zero points for OV 4.

## 2. OV 9

Defendant next argues that the trial court erred in assessing 10 points for OV 9. Under OV 9, the trial court must score 10 points when there were "2 to 9 victims who were placed in danger of physical injury or death." MCL 777.39(1)(c). The statute instructs the sentencing court to "[c]ount each person who was placed in danger of physical injury or loss of life or property as a victim." MCL 777.39(2)(a).

The trial court assessed 10 points for OV 9 based on multiple victims because there was a child near Ross when defendant shot him. Defendant argues that only Ross was endangered by defendant shooting him at close range because it was not dangerous to be in the vicinity of the shooting. Scoring OV 9 for multiple victims may be appropriate if there were other individuals present at the scene of a crime "who were placed in danger of injury or loss of life." *McGraw*, 484 Mich at 129 (cleaned up). Here, Ross testified that defendant shot him while his children were only a few feet away and his fiancé was also near. In *People v Kimble*, 252 Mich App 269, 274; 651 NW2d 798 (2002), this Court held that it was proper to assess 10 points for OV 9 where the victim's fiancé and child were both next to the victim when defendant shot the victim. This case is no different. The trial court did not err in finding that those who were very near to Ross at the time of the assault were endangered by defendant shooting in their vicinity, particularly considering that Ross and defendant's wife may have been pulling on the gun and defendant's arm when he shot. A preponderance of the evidence supported the trial court assigning 10 points to OV 9.

## 3. OV 19

Defendant next argues that the trial court should have assessed zero points, rather than 25 points, for OV 19, "threat to the security of a penal institution or court or interference with the administration of justice or the rendering of emergency services." MCL 777.49. The statute provides that a trial court should assess 25 points for OV 19 where "[t]he offender by his or her conduct threatened the security of a penal institution or court." MCL 777.49(a). The factors considered in OV 19 include events that almost always occur after the charged offense has been completed. *People v Smith*, 488 Mich 193, 200; 793 NW2d 666 (2010).

The trial court assessed 25 points for OV 19 based on the danger posed when defendant refused to go to the detainment area after the verdict, pulled away from officers, did not respond to police commands, and had to be subdued by multiple officers with a taser. The trial court

relied on its own observations and a report of the incident from an involved officer. A defendant's conduct while in custody, or in the "administration of justice" phase of the sentencing offense, may be considered for purposes of scoring OV 19. *People v Carpenter*, 322 Mich App 523, 530-531; 912 NW2d 579 (2018).

Defendant argues that he could not have been a threat to the trial court because he was handcuffed. Defendant's lack of compliance and physical resistance to police officers surely could have caused harm to those officers, despite the fact that he was handcuffed, and his volatility in the situation made his behavior unpredictable. The extent of defendant's belligerent conduct was such that it required multiple officers and a taser to subdue him. Thus, a preponderance of the evidence established that defendant's conduct was a threat to the security of the trial court, supporting the assignment of 25 points for OV 19.

A reduction of the total OV score by 10 points owing to the erroneous scoring of OV 4 would reduce defendant's total OV score to 90. Defendant would remain at level VI (over 75 points), and the guideline range would not change. See MCL 777.65. Resentencing is not required where a scoring error does not alter the guidelines range. *Francisco*, 474 Mich at 89-90.

Affirmed.

/s/ Michael J. Kelly
/s/ Karen M. Fort Hood
/s/ Brock A. Swartzle