*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

MARSHA SHARLENE RUTHERFORD,

      Defendant-Appellant.

UNPUBLISHED
February 11, 2020

No. 344220
Wayne Circuit Court
LC No. 15-003179-01-FH

Before: RONAYNE KRAUSE, P.J., and K. F. KELLY and TUKEL, JJ.

PER CURIAM.

Defendant appeals as of right her jury trial convictions for embezzlement of $100,000 or more, MCL 750.174(7), conspiracy to embezzle $100,000 or more, MCL 750.157a, false pretenses involving a value of $100,000 or more, MCL 750.218(7), conspiracy to commit false pretenses involving a value of $100,000 or more, MCL 750.157a, identity theft, MCL 445.65, and using a computer to commit a crime, MCL 752.796. She was sentenced to 3 to 5 years' imprisonment for the identity theft conviction and 10 to 20 years' imprisonment for all other convictions, with the terms to be served concurrently. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Defendant met Lashantinette Whitaker Obioha (Obioha)[1], the controller of Archer Corporate Services (ACS), through her church. Obioha revealed that she had been writing checks to herself from the ACS corporate account without authorization, deleting the entry in the corporate books, and replacing the entry by naming an actual customer of the business. Only the CEO and president were authorized to sign checks, and Obioha was required to present checks for signature with documentation to support the check. Eventually, Obioha began to forge the president's

---

[1] Obioha was referred to as "Whitaker" by some witnesses and at some hearings. Whitaker is Obioha's maiden name, and during the course of her criminal conduct, she married and took her husband's name. For consistency purposes, references to Whitaker or Obioha will be to "Obioha." She was also originally a co-defendant in this case, but pleaded guilty before the first trial.

-1-

signature on fraudulent checks. Because the underlying bank records were not examined, her embezzlement went undetected. Defendant was the owner, operator, and CEO of PHC Global (PHC) and BNM Transportation Corporation (BNM). Obioha began to write checks to defendant's companies, and defendant endorsed the checks and cashed them. The plan was to split the proceeds. Eventually, the two women set up a corporation similar to the name of Obioha's employer and created false invoices to defraud a company based in Alabama, Porter Billing Services (Porter), of nearly $500,000. The women stole nearly two million dollars in the course of their criminal enterprise. Obioha claimed she received only approximately $200,000 of that money, and she tried to stop the activity, but defendant threatened to report Obioha to her employer. Obioha eventually confessed her crimes when corporate documents were subpoenaed in a divorce action involving the CEO of ACS. Obioha entered into a plea agreement and testified against defendant.

The first trial ended in a mistrial when a witness volunteered that defendant did not testify in his divorce action because she asserted her Fifth Amendment rights. Although the trial judge admonished the prosecutor for knowing defendant did not testify, the court held that retrial was not barred. The first trial judge disqualified herself after a staffing conflict arose, and a successor judge presided over the second trial. The second trial also ended in a mistrial when a witness disclosed that the police took notes when she made a statement, and the notes were not provided to the defense. The successor trial judge ordered that the discovery be provided to the defense. Defendant moved for dismissal, citing a *Brady*[2] violation and asserting that additional exculpatory information was excluded. The successor judge denied the motion for dismissal. Defendant was convicted as charged at the third jury trial.

## II. DOUBLE JEOPARDY

First, defendant alleges that the trial court erred in allowing a third retrial to occur when the first two mistrials were caused by prosecutorial misconduct, and therefore, retrial was barred by double jeopardy.[3] We disagree.

A double jeopardy challenge presents a question of constitutional law reviewed de novo on appeal. *People v Ream*, 481 Mich 223, 226; 750 NW2d 536 (2008). Defendant preserved this issue for appellate review by objecting in the trial court. *People v Ackah-Essien*, 311 Mich App 13, 30; 874 NW2d 172 (2015).

---

[2] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

[3] Although defendant characterizes the prosecutor's statements as misconduct, this Court recently explained that a fairer label for most claims of prosecutorial misconduct would be "prosecutorial error," because only the most extreme and rare cases rise to the level of "prosecutorial misconduct." *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). However, we will use the phrase "prosecutorial misconduct" because it has become a term of art in criminal appeals. *Id*.

Const 1963, art 1, § 15 provides that "[n]o person shall be subject for the same offense to be twice put in jeopardy."

> The Double Jeopardy Clause affords individuals "three related protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense." [*People v Bobby Smith*, 478 Mich 292, 298; 733 NW2d 351 (2007).]

> The Double Jeopardy Clause precludes the prosecution from making repeated attempts to convict a defendant for the same offense. Once jeopardy has attached, the accused has a valuable right in having his or her trial concluded by the jury sworn to hear the case.

> Generally, jeopardy attaches in a jury trial once the jury is empaneled and sworn. Once jeopardy attaches, the defendant has a constitutional right to have his or her case completed and decided by that tribunal. "If the trial is concluded prematurely, a retrial for that offense is prohibited unless the defendant consented to the interruption or a mistrial was declared because of a manifest necessity." [*Ackah-Essien*, 311 Mich App at 31-32 (citations omitted).]

In *People v Dawson*, 431 Mich 234, 236; 427 NW2d 886 (1988), our Supreme Court addressed double jeopardy in the context of prosecutorial misconduct:

> The double jeopardy provisions of the Michigan and federal constitutions protect an accused from being twice put in jeopardy for the same offense. "Being twice put in jeopardy" includes being subjected to a retrial after the initial prosecution ends in a mistrial. An exception to the double jeopardy bar has been made, and retrials allowed, where the prosecutorial or judicial errors requiring the mistrial appear to have been innocent or were beyond the prosecutor's control. A general exception has also been made where the mistrial was granted on the defendant's motion or with his consent. Where prosecutorial misconduct provoked the defendant's motion for mistrial, however, the Double Jeopardy Clause has sometimes been held to bar retrial.

> This appeal presents the question when, where the court finds that prosecutorial conduct provoked a defendant's motion for mistrial, the double jeopardy provision bars retrial. We adopt the federal standard and hold that retrial is barred where the prosecutor intended to goad the defendant into moving for a mistrial. [*Id*. at 235-236 (footnotes omitted).]

The trial court's factual findings regarding whether the prosecutor intended to goad the defendant into moving for a mistrial are reviewed for clear error. *Id*. at 258. With regard to a claim of intentional prosecutorial misconduct in the context of discovery, "a defendant's due process rights to discovery may be implicated: (1) where a prosecutor allows false testimony to stand uncorrected; (2) where the defendant served a timely request on the prosecution and material evidence favorable to the accused is suppressed; or (3) where the defendant made only a general

request for exculpatory information or no request and exculpatory information is suppressed." *People v Tracey*, 221 Mich App 321, 323-324; 561 NW2d 133 (1997).

In the first trial, the CEO of ACS was on the stand being questioned by the prosecutor when the following exchange occurred:

> *Q*. Okay. Now, defense counsel was asking you some questions about a subpoena with regard to a divorce case, is that correct?
>
> *A*. Yes.
>
> *Q*. And you indicated that you - - you knew that Ms. Obioha was subpoenaed to testify in your divorce case, is that correct?
>
> *A*. Yes.
>
> *Q*. Um, Ms. Rutherford was subpoenaed to testify in your divorce case, too, wasn't she?
>
> *A*. Yes.
>
> *Q*. Okay. And did you instruct Ms. Rutherford not to testify?
>
> *A*. Ah, no. I didn't know her.
>
> *Q*. Did she take the stand?
>
> *A*. Yes.
>
> *Q*. And did she testify?
>
> *A*. Ah, um, she – she—
>
> *THE COURT (*Interposing). Were you there?
>
> *A*. Yes, I was there. She pleaded the Fifth on- -
>
> *[Defense Counsel (Interposing)]*. Objection.
>
> *THE COURT*. That's inappropriate for you to ask that- -
>
> *[Defense Counsel (Interposing)]*. I - - I gotta' move for a mistrial.
>
> *[The Prosecutor]*. That has nothing to do with this case. He opened the door.

The trial court excused the jury, and defense counsel moved for a mistrial, stating that it was an inappropriate question for the prosecutor to ask because she knew the answer. The prosecutor insisted that defense counsel opened the door to the questioning. The trial court

adjourned the matter to conduct research. The court reconvened and granted the mistrial, but held that the prosecutor's actions were negligent, but not intentional, permitting retrial. The court made the following findings:

> I do not believe in any form or fashion that the questioning by the prosecution was intentional. I believe that it was an attempt to, as what she believed, that the defense had opened the door regarding the issue of not having witnesses to testify.
>
> And that in that vein, she believed that because the door was opened, any witness' failure to testify was fair game.
>
> So, therefore, it was believed, I believe that those questions envisioned that. Her response after and during the trial - - I mean during the questioning and then after we excused the jury supported that and there's no evidence to the contrary.
>
> The only thing that the Court is indicating that was troublesome was that the fact that she knew prior, but there was no intent whatsoever by the People to have him to [sic] say that. I do believe that you asked the question it was a yes or no question - - I mean a yes or no answer.

The trial court held that because the prosecutor did not engage in misconduct and the exchange was "negligent at best," it scheduled a new trial date. The court noted that a mistrial was warranted and the only remedy because the words "Fifth Amendment" were used.

In the second trial, it was learned during Obioha's testimony that notes were taken by police during her interview, but they were not turned over to the defense. The prosecutor stated that she had made every effort in the course of the case and with the multiple attorneys assigned to provide discovery. The court ordered that the discovery be provided.

When trial resumed, defense counsel requested a mistrial and dismissal for a *Brady* violation, contending that additional transcripts were provided, that exculpatory material was discovered, and that defendant concurred in the request for a mistrial. The prosecutor disagreed that even a mistrial was warranted and disputed the contention that exculpatory insurance information was provided. The successor trial judge ruled as follows:

> First of all, with regards to the notion [sic] to dismiss, I'm going to deny that motion. If there is a discovery violation, Michigan Appellate Court clearly indicates that the Court is to consider dismissal as the most serious consequence for a violation and is only in the most unusual circumstance is that to be given.
>
> So that motion is denied.
>
> With regards to the concern about the insurance certificate, quite frankly that's something that [defendant] was on notice about. She is the one who obtained the insurance. That certainly cannot and should not come as any surprise.

Let me get to what is the heart of my concern, and my concern has to do with, and I will say that I do think it was, as was I think referred to even by Ms. Blaney, that this was an inadvertent oversight on the part of the police department in this particular matter.

But there is deposition testimony from Mr. Carr that does run counter to, could be interpreted as running counter to what the witness has testified here today in terms of Mr. Carr relating the fact that Ms. Obiaha [sic] said, according to Mr. Carr, she was blackmailed. That's why she was giving up the money.

That certainly is something of consideration.

There are a few points there. I think certainly the defense might be able to be prepared in that circumstance to adjust for that cross-examination.

However, there is a 22-page interview of the defendant by another party. That is something that was in the possession of the police department not turned over until over the weekend.

That, while I understand the People's position, that this is reiterating some of what the defendant has maintained throughout this particular case, that there is a 22-page statement where there may be other portions that are different.

There is also documentation and information here relating to contacts with Millennium Funding with the president. That is also new information supplied to the defense as well, along with copies of what we'll refer to I think as an a Castigar [sic] letter to Mr. Carr from the United States Attorney's Office.

Rare indeed has been the case that I have found that a mistrial is appropriate. In this particular case the testimony of Ms. Obiaha [sic] and Mr. Carr, I assume are going to be key to the case along with the other documentary evidence.

I do find that it is troubling that Mr. Carr's deposition testimony from May 13th of 2014 in the divorce, which relates to his conversations with Ms. Obiaha [sic], was not shared with the defense earlier and that there was knowing that was [sic] 23-page statement taken from the defendant that was not disclosed.

So for those reasons I am going to grant the motion for a mistrial.

Thus, in both prior trials, the judges declined to find that the prosecutor engaged in misconduct, and furthermore, there was no evidence that the prosecutor goaded the defense into seeking a mistrial. Rather, in the first trial, the trial court accepted the explanation that the prosecutor believed that the subject matter was raised by the defense, and that witness Carr could have answered the question with "yes" or "no" and did not need to volunteer that defendant exercised her Fifth Amendment rights in his divorce trial. Thus, the trial court made an express factual finding that the prosecutor did not engage in deliberate misconduct, and in light of the record, we cannot conclude that this finding was clearly erroneous. *Tracey*, 221 Mich App at 325.

In the second trial, the successor trial judge was asked to dismiss premised on a *Brady* violation, with the defense asserting that exculpatory information existed, but had not been disclosed. Although the judge expressed concern that discovery was available, but not turned over, he made no such finding that exculpatory evidence was withheld.[4] Additionally, although defendant raised this issue on appeal, she failed to identify or cite to exculpatory documentation that was purportedly withheld by the prosecutor.[5] More importantly, neither trial judge made a factual finding that prosecutorial misconduct or deliberate goading occurred to cause the mistrial and bar retrial. Under the circumstances, defendant's contention that the mistrials were caused by prosecutorial misconduct or *Brady* violation, warranting application of double jeopardy to bar retrial, does not entitle her to appellate relief in light of a lack of record evidence.

## III. ADMISSION OF EVIDENCE

Defendant next submits that the trial court improperly admitted other acts evidence pursuant to MRE 404(b) and erroneously excluded evidence of Obioha's perjury. We disagree.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). When a ruling excludes evidence, it is incumbent upon the party seeking admission to make an offer of proof, and error may not be predicated on the exclusion of evidence unless a substantial right of the party is affected. *People v Witherspoon*, 257 Mich App 329, 331; 670 NW2d 434 (2003). The appellate court reviews a

---

[4] Both trial judges noted the unique nature of the case because of the voluminous documents involved in the perpetration of the embezzlement. Indeed, the principal prosecutor of the third trial noted that he had 19 binders of material. However, the nature of the proofs changed. Initially, the prosecutor intended on proving the case with the aid of expert testimony, but changed course after Obioha agreed to plead guilty and testify against defendant. During the course of the case, defendant retained or had appointed eight different attorneys. Furthermore, the trial prosecutor also changed on numerous occasions. Because of the volume of discovery involved and the number of attorneys that represented the parties, the trial judges recognized the difficulty the case presented and did not find intentional withholding or misconduct.

[5] After it was learned that the police took notes during Obioha's statement, the trial court ordered that the statement be turned over. Additional discovery apparently was disclosed that weekend. When trial resumed, defense counsel orally moved for dismissal, contending it was the appropriate remedy for failure to disclose exculpatory evidence. The trial court did not find that exculpatory material was withheld. We note that before the third trial commenced, defendant did not formally file a motion with attachments of documentary evidence to support her contention that nondisclosure of exculpatory evidence occurred and that the rules of discovery, MCR 6.201, were violated. The function of the Court of Appeals is to act as an error correcting court, *Burns v Detroit (On Remand)*, 253 Mich App 608, 615; 660 NW2d 85 (2002), and thus, it is imperative that record evidence be preserved for appellate review. In the absence of such a record, defendant cannot prevail.

trial court's decision to admit or exclude evidence for an abuse of discretion. *People v Edwards*, 328 Mich App 29, 34; 935 NW2d 419 (2019).

MRE 404(b)(1) provides that evidence of other crimes, wrongs, or acts is inadmissible to prove a person's character to show action in conformity therewith. However, such evidence is admissible for a proper purpose, such as proof of motive, opportunity, intent, preparation, scheme, plan, or scheme in doing an act.

> In determining the admissibility of other-acts evidence, the trial court must determine (1) whether the evidence is offered for a proper purpose under MRE 404(b), (2) whether the evidence is relevant under MRE 401 and 402, and (3) whether the probative value of the evidence is substantially outweighed by unfair prejudice under MRE 403. *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993). Also, upon request, the trial court may provide a limiting instruction. *Id*. at 75. [*People v Roscoe*, 303 Mich App 633, 645-646; 846 NW2d 402 (2014).]

The threshold for relevant evidence is minimal. *Id*. at 646.

A witness may not be impeached with extrinsic evidence on a collateral matter. *People v Roper*, 286 Mich App 77, 105; 777 NW2d 483 (2009). This rule applies even if the extrinsic evidence constitutes a prior inconsistent statement of the witness. *People v Rosen*, 136 Mich App 745, 758; 358 NW2d 584 (1984). "Collateral matter" has been defined as any matter on which evidence could not have been introduced for a relevant purpose. *People v Steele*, 283 Mich App 472, 488; 769 NW2d 256 (2009).

A. Admission of Michael Baumhaft Testimony

First, defendant contends that it was improper to admit the testimony of Baumhaft regarding his agreement to engage in a trucking business with defendant because it involved a failed business venture as opposed to a fraudulent business venture.

Under the circumstances, we conclude that the trial court's decision to admit this other acts evidence did not constitute an abuse of discretion. Although defendant characterizes their transaction as a failed business venture, the testimony at trial indicated that defendant had no interest in pursuing a valid business, but instead used a methodology to fund her expensive lifestyle. Baumhaft testified that as an African-American female, defendant had the opportunity to secure transportation contracts. Consequently, he entered into a business venture with her to purchase specific tractor trailers to engage in the fracking business. Although he was to provide the necessary funding, he could not obtain documentary evidence from defendant to support the expenditures. When Baumhaft was finally able to obtain invoices, he learned that they were fraudulent. Specifically, if an invoice was submitted for uniforms, the actual cost of the uniforms was raised ten-fold. Although Baumhaft was responsible for providing fuel cards, he learned that the trucks he purchased were not in operation and not insured.

This course of conduct by defendant to Baumhaft was consistent with defendant's representations to Obioha. Defendant indicated that she obtained money from Porter to start a trucking school. However, there was no indication that defendant expended funds toward that valid business venture. Instead, Obioha was asked to provide fraudulent invoices regarding the

-8-

delivery of iPads to obtain money from Porter. Thus, the evidence offered by Baumhaft was for a proper purpose, to show defendant's common plan or scheme, the evidence was relevant, and the probative value of the evidence was not outweighed by prejudice. *Roscoe*, 303 Mich App at 645-646.[6]

### B. Impeachment of Obioha with Recommendation Letter

With regard to the impeachment through the letter of recommendation, the following developed at trial. At the start of trial, defense counsel represented that he contacted Kenneth Goddard the day before. Goddard was purportedly the person who wrote a reference letter for Obioha that she gave to the prosecutor. Goddard was not sent a copy of the letter, but defense counsel represented that he read the content over the phone. Goddard indicated that Obioha would not have worked for him because of the corporate structure, and he did "not know the name." The prosecutor opposed admission, stating that he had no intention of admitting the letter and it would constitute impeachment on a collateral issue as well as improper bad acts for which no prior notice was given. The trial court questioned how the evidence would be introduced because the prosecutor had no intention of admitting the evidence, and it pertained to a collateral issue. The court indicated that the evidence was excluded previously, but defense counsel Blaney stated that there was no ruling on the admission in the prior trial. The court instructed the parties to review the transcripts and not cite to the evidence in opening statement.

When the issue was revisited on the fourth day of trial, defense counsel asserted that he tracked down the author of Obioha's letter of recommendation. Although the letter of recommendation was authored by Kenneth Goddard, counsel represented that he spoke with Paul Bernier. The following was stated on the record:

> So in the second trial that was before you, your Honor, that issue came up, and at that time there was proffered, though not admitted, proffered letter purporting to be from a person, a Kenneth Goddard from Aristeo, which was her employer indicating all these great things about her.
>
> Now at that time it wasn't allowed to come in at that point in time. However, we have now through our investigation since that date made contact with Aristeo and her supervisor who was there that indicates that no, this was never - - all right. This was never cleared up. And then Mr. Gooddard [sic] had left Aristeo about a month after Ms. Obioha. He left the state.
>
> We were finally able to track him down through linked-in, and it turned out that he actually was on Paul Bernier's, was linked with Paul Bernier, and I called Paul and was able to talk to him last Monday in which I asked him, I read him the contents of the letter. He said, I don't remember the name, the accounting function

---

[6] We note that in response to the evidence defense counsel attacked the credibility of defendant's associates, Baumhaft for using a different name and having a 2015 false pretenses conviction, and Obioha for engaging in her own embezzlement before any involvement with defendant.

didn't work for me. It was my division, and I don't remember ever signing or authoring a letter of recommendation. He didn't recognize the name of that.

The prosecutor argued that the evidence constituted impeachment on a collateral matter, there was a dispute regarding whether the letter was false, and it was improper MRE 404(b) evidence. The trial court agreed with the prosecution, noting that the evidence was an unnecessary response that raised the issue of character, and her prior employment was a collateral matter particularly in light of Obioha's admissions that she stole from ACS. The trial court held that if Obioha introduced the evidence when she testified, she opened the door to allowing the defense to raise the issue.

We conclude that defendant failed to make a sufficient offer of proof. Initially, he stated that the letter was written by Goddard. However, when the issue was revisited, he seemingly indicated that the letter was authored by Bernier. The letter was not preserved in the lower court file. Furthermore, defense counsel failed to obtain an affidavit from Bernier. More importantly, the statement made on the record did not result in an unequivocal denial of *writing* the letter. Rather, Bernier indicated that he *did not remember* ever signing or authoring a letter of recommendation. There is a distinction between failing to engage in the act of writing a letter of recommendation and failing to recall it. Furthermore, there was no indication that defense counsel sought Obioha's employment records to verify the validity of the information he received. There was no indication that he pursued learning who Obioha's supervisor was. Finally, the validity of the recommendation letter was not established and presented a collateral matter, particularly where defendant was able to attack Obioha's credibility because of her own theft that precipitated their collaboration. *Roper*, 286 Mich App at 105. Under the circumstances, defendant failed to establish the truth or falsity of any letter of recommendation, and therefore, the trial court did not abuse its discretion by excluding this evidence. *Edwards*, 328 Mich App at 34.

IV. SENTENCE

Defendant alleges that the trial court sentenced defendant premised on erroneously scored guidelines and that the sentence violated the principle of proportionality. We disagree.

A. Offense Variable 14

MCL 777.44 addresses the offender's role and provides as follows:

(1) Offense Variable 14 is the offender's role. Score offense variable 14 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

(a) The offender was a leader in a multiple offender situation . . . 10 points

(b) The offender was not a leader in a multiple offender situation . . . 0 points

(2) All of the following apply to scoring offense variable 14:

(a) The entire criminal transaction should be considered when scoring this variable.

-10-

(b) If 3 or more offenders were involved, more than 1 offender may be determined to have been a leader.

In *People v Rhodes (On Remand)*, 305 Mich App 85, 89; 849 NW2d 417 (2014), the victim was walking home when he stopped in a gas station. After he left the gas station to continue home, two men jumped out of a car, ordered the victim to the ground, and asked what he was laughing at in the gas station. The victim did not comply, and both men began to hit the victim. The defendant had a gun, and it discharged, injuring the victim. The victim was able to run away, but more shots were fired at him as he ran away. The trial court scored OV 14 at 10 points for the defendant's leadership role, concluding that his possession of a weapon made him the leader. This Court acknowledged that the Legislature did not define the term "leader" for purposes of OV 14 and examined the dictionary to determine the meaning:

> The Legislature did not define by statute what constitutes a leader for the purposes of OV 14. We have not found any binding caselaw defining "leader" in this context. Consequently, we turn to the dictionary. . . . According to *Random House Webster's College Dictionary* (2001), a "leader" is defined in relevant part as "a person or thing that leads" or "a guiding or directing head, as of an army or political group." To "lead" is defined in relevant part as, in general, guiding, preceding, showing the way, directing, or conducting. The evidence unequivocally supports the trial court's factual determination that defendant possessed a gun and the only other person involved in the criminal transaction did not. However, the evidence does not show that defendant acted first, gave any directions or orders to Adams [co-defendant], displayed any greater amount of initiative beyond employing a more dangerous instrumentality of harm, played a precipitating role in Adams's participation in the criminal transaction, or was otherwise a primary causal or coordinating agent.

> We remain of the opinion that defendant's exclusive possession of a gun during the criminal transaction is *some* evidence of leadership, however it does not meet the preponderance of the evidence standard found in *Hardy*. This fact alone does not support the finding by the trial court that defendant issues orders that Adams did not. The record simply fails to reflect any other evidence of leadership. Under the dictionary definition of leadership, we cannot conclude that merely posing a greater threat to a joint victim is sufficient to establish an individual as a leader within the meaning of OV 14, at least in the absence of any evidence showing that the individual played some role in guiding or initiating the transaction itself. We are therefore constrained to reverse the trial court's scoring of OV 14, which should have been scored at zero points. [*Id*. at 90-91.]

In *People v Jones*, 299 Mich App 284, 285; 829 NW2d 417 (2013), vacated in part on other grounds, 494 Mich 880 (2013),[7] the defendant was charged for his role in a shooting at a mall. The defendant and at least one other friend known as "Taiwan," targeted another group of men at

---

[7] The Supreme Court vacated this Court's citation to the "any" evidence standard to support the scoring decision because the preponderance of the evidence standard applied.

the mall.  Both men were armed and drew their guns during the confrontation, but only the defendant fired his weapon.  *Id*.  On appeal, the defendant did not dispute the term "leader," but asserted that a multiple offender situation did not occur because there had to be more than one person actively participating in the charged offenses for that to arise.  Because he was the only person who committed the assaults and the only person charged, OV 14 was improperly scored.  *Id*. at 285-286.

This Court noted that the entire criminal transaction had to be examined to address the offender's role.  *Id*. at 286.  Additionally, because "multiple offender situation" was not defined by the Legislature, a dictionary was examined for guidance.  The Court stated as follows:

> The word "multiple" is defined as "consisting of more than one." *New Illustrated Webster's Dictionary of the English Language* (1992); see also *Random House Webster's College Dictionary* (2001) (defining "multiple" as "consisting of, having, or involving several or many individuals, parts, elements, relations, etc."). An "offense" is defined as a "transgression of the law," and an "offender" indicates a person who violated the law.  See *Random House Webster's College Dictionary* (1997).  Moreover, the statute's use of the word "leader" is significant when considering the context of the statute's use of the phrase "multiple offender situation."  The word "leader" is not defined in the statute; however, the dictionary defines a "leader" as one who is a "guiding or directing head" of a group.  *Id*. Therefore, the plain meaning of "multiple offender situation" as used in OV 14 is a situation consisting of more than one person violating the law while part of a group.

> In this case, no other defendants were placed on trial for the shooting at the mall; defendant was the only person charged in connection with the shooting. However, the trial court did hear testimony that at least one other man, identified at trial as "Taiwan," accompanied defendant in the mall to confront the other group of young men.  Moreover, trial testimony illustrated that the groups had a bad history with one another.  The testimony further illustrated that the confrontation between the groups initially started out as "trash-talk" and that the group opposing defendant and Taiwan believed that there would be a fistfight; however, defendant and Taiwan escalated the confrontation from trash-talk when they both drew guns and defendant started firing.  Several witnesses testified that they heard a loud disturbance, looked to see what was happening, and saw people panicking.  Because there was evidence in this case of a multiple-offender situation, i.e., a situation consisting of both defendant and Taiwan violating the law while part of a group, we conclude that the trial court did not err by assessing 10 points for OV 14.  [*Id*. at 287-288.]

In *People v Dickinson*, 321 Mich App 1, 5; 909 NW2d 24 (2017), corrections officers received word that the defendant may try to pass contraband to an inmate [Cain].  Consequently, the defendant's visit occurred within five feet of the observation window and was recorded.  The defendant went to a vending machine, made a purchase, sat next to the inmate, crinkled a napkin, and placed it on a tray.  The inmate grabbed the napkin, and officers recovered a blue balloon with a substance that tested positive for heroin.  The defendant was assessed 10 points for OV 14 which she challenged on appeal.  This Court rejected the issue, ruling:

In scoring OV 14 in this case, the trial court considered the "entire criminal transaction" as required under MCL 777.44(2)(a). Our review of the record leads us to conclude that the trial court's findings that defendant procured the heroin, possessed it for a period of time, transported it to the prison, and delivered it to Cain were supported by a preponderance of the evidence and were not clearly erroneous. The trial court did not misinterpret or misapply the sentencing guidelines by determining that defendant acted as a leader. Cain obviously could not leave the prison to procure the heroin himself. It was reasonable to infer, as the trial court did in this case, that defendant exercised independent leadership to procure the heroin from someone else outside the prison, transported it independently to the prison, and smuggled it inside before transferring it to Cain. A trial court may draw inferences regarding a defendant's behavior from objective evidence when sentencing the defendant. Consequently, we hold that the trial court correctly scored OV 14 at 10 points for defendant's role in the criminal transaction. [*Id*. at 23 (citation omitted).]

In the present case, the parties disputed the application of OV 14. The prosecutor asserted that defendant used extortion and threats to get Obioha to continue to write checks to pay off defendant's debts and then created a fake corporation to defraud Porter of money, but the defense contended that Obioha was the leader because she initiated the fraudulent activity and brought defendant on board. The trial court ruled:

OV 14 indicates that the Court is to consider the entire criminal transaction in determining the offender's role. In this particular matter as I indicated I think Ms. Obioha had her own sense of greed. That was in fact the motivation for her to collaborate with [defendant].

The totality of the evidence presented though I think shows beyond any reasonable doubt whatsoever that the true leader and orchestrator and pressure driver in this particular matter was [defendant].

In this Court's view [defendant] was clearly the leader in this particular event. She's the one who kept pushing for more and more fraudulent and embezzlement events to take place. She's the one who benefited the most financially. In this Court's view she was the leader. She will be scored 10 points on OV 14. . . . The defense's objection is noted.

We recognize that Obioha initiated the embezzlement of funds from her employer ACS. However, after Obioha brought defendant into the embezzlement, the amount of funds taken and the efforts to hide the theft increased dramatically. Obioha would write a check to herself through the Peachtree software, delete it from the system, and identify the transaction as occurring with an approved vendor. After defendant began to participate, the fraud extended to include other companies and ACS' business address, financial documents, and fraudulent identifying invoices were used to secure $500,000 from Porter. This method of operation was not commensurate with Obioha's embezzlement from ACS, but rather, was consistent with how defendant managed to defraud Baumhaft in their agreement to operate a trucking business. After the women began to work in concert, the embezzlement of ACS seemed primarily used to pay off defendant's creditors

and to allow defendant to fund her lifestyle. Indeed, although the women stole nearly two million dollars and were supposed to split the proceeds, Obioha acknowledged that she was not a good thief because she only obtained approximately $200,000. To continue to perpetrate the fraud without detection, there were attempts to have defendant's corporation serve as a vendor. Although defendant also submits that she could not be the leader in a multiple offender situation because the Porter fraud was executed on her own, she had to obtain Obioha's participation to submit the tax returns of ACS in order to have the agreement approved. Additionally, Obioha testified regarding her attempt to end the relationship, but defendant's threats and demands caused her continued perpetration of fraud.

The trial court's factual determinations addressing the sentencing guidelines are reviewed for clear error and must be supported by a preponderance of the evidence, and the facts as applied to the law are reviewed de novo. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). After reviewing the record as a whole, MCL 777.44(2)(a), we cannot conclude that the trial court's factual findings were clearly erroneous. Irrespective of Obioha's initiation of embezzlement from ACS, the scope and form of the fraudulent conduct expanded after defendant's involvement and was consistent with how she acted in the transaction with Baumhaft. The 10-point score for OV 14 was supported by the record, and the trial court did not clearly err.

## B. Principle of Proportionality

Although recognizing that the sentencing guidelines are advisory, defendant asserts that her sentence was disproportionate because the trial court departed six years above the applicable guidelines without sufficient justification. We disagree.

A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness, and there is no requirement that the sentencing court articulate a substantial and compelling reason for that departure. *People v Lockridge*, 498 Mich 358, 365-365, 392; 870 NW2d 502 (2015). The legislative sentencing guidelines are advisory, and the appropriate inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the principle of proportionality. *People v Steanhouse*, 500 Mich 453, 459; 902 NW2d 327 (2017). On appeal, the reasonableness of a sentence is reviewed for an abuse of discretion. *Id*. at 471. To determine whether a departure sentence is more proportionate than a sentence within the guidelines range, the trial court should consider whether the guidelines accurately reflect the seriousness of the crime, factors not considered by the guidelines, and factors considered by the guidelines, but given inadequate weight. *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017). To facilitate appellate review, the trial court must justify the sentence imposed with an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been. *Id*.

In the present case, the sentencing court explained that the embezzlement statute pertained to $100,000 and did not account for the fact that nearly $2,000,000 was embezzled in this case. The court also noted that rehabilitation was unlikely in light of defendant's total lack of insight or remorse, and her placement of blame on others. Although defendant attributed her situation to her trust in others, the sentencing court stated that defendant was a greedy and deceptive person who committed the acts not to benefit the disadvantaged, but to obtain "wretched personal excess" in light of the designer shoes, clothes, and handbags that were purchased. Additionally, the court

cited to the near financial catastrophe to several businesses and employees as a result of defendant's actions. In light of the trial court's articulation regarding the inadequacy of a sentence within the guidelines range, we cannot conclude that the sentence constituted an abuse of discretion.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

In her Standard 4 Brief, defendant contends that trial counsel was ineffective. We disagree.

"Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). This Court reviews a trial court's factual findings for clear error and its conclusions of law de novo. *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019). When no *Ginther*[8] hearing is held in the trial court, appellate review is limited to mistakes apparent on the record. *Id*.

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *People v Schrauben*, 314 Mich App 181, 189-190; 886 NW2d 173 (2016). To obtain a new trial premised on ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). It is presumed that defense counsel was effective, and a defendant must overcome the strong presumption that counsel's performance was sound trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "[D]ecisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013). "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996). However, counsel may be found ineffective for the strategy employed when it is not a sound or reasonable strategy. *People v Dalesandro*, 165 Mich App 569, 577-578; 419 NW2d 609 (1988). The burden of establishing the factual predicate for a claim of ineffective assistance is on the defendant. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

### A. Credibility of Obioha

As noted in section III, *supra*, when the third trial occurred, defense counsel indicated that Obioha testified at an earlier trial that she was not discharged from prior employment for misconduct and provided a letter of recommendation from the employer. At the third trial, defense counsel represented that he contacted the prior employer and her assertions were not true. The prosecutor noted that he had no intention of admitting the letter, and the issue presented a collateral matter. The trial court questioned why the information was necessary when Obioha was an admitted thief as reflected by her guilty plea and her testimony. The trial court excluded the

---

[8] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

evidence, but noted that if Obioha testified regarding her character or opened the door to this evidence, it would be admitted.

In her Standard 4 brief, defendant contends that trial counsel was ineffective for failing to present a substantial defense by admitting the evidence. However, defendant's counsel did what they could; they sought admission of the evidence, and the trial court's ruling excluded the evidence. Defendant's statement of the issue does not challenge the court's evidentiary ruling.

Defendant fails to recognize that defense counsel sought to admit the evidence and when it was not admitted, counsel nonetheless attacked the credibility of Obioha, noting that she committed embezzlement prior to her involvement with defendant and pleaded guilty. Additionally, the defense argued that Obioha pleaded guilty to obtain a favorable plea deal and essentially made defendant the "scapegoat." This claim of error is without merit.

## B. Admission of Expert Testimony

Defendant next submits that trial counsel was ineffective for failing to retain an expert computer analyst. She acknowledges that a police expert was retained, but the trial court excluded the witness, concluding that the expert did not have the requisite experience and expertise. Defendant maintains that the court should have appointed a "handwriting and a computer expert," and this deprived her of a substantial defense.

In order to establish a claim of ineffective assistance of counsel, the defendant bears the burden of demonstrating the factual predicate for the claim. *Hoag*, 460 Mich at 6. Defendant made a blanket assertion that the failure to present experts deprived her of a substantial defense yet she did not present an affidavit indicating that a handwriting expert viewed the bank signature cards and that defendant did not sign those cards. Therefore, defendant failed to support this claim of error.

## C. Failure to Investigate

Defendant asserts that trial counsel failed to investigate and prepare the case and only met with her once. She concludes that the signature card at Chase Bank did not contain her signature, and that securing this evidence would have caused the trial outcome to be different. She also states that the handwriting analyst from Speckin Forensic Laboratories found that it was not her signature.

Again, defendant was assigned numerous counsel over the three-years in which the case was pending. Although she claims that counsel only met with her once, she does not specify which counsel and failed to provide an affidavit in support. Irrespective of the number of times that she met with a particular attorney, defendant failed to correlate the lack of meetings to a specific deficiency at trial.

Additionally, defendant contends that her expert determined that she did not sign the signature card at Chase Bank. However, defendant cites an attachment, but that document is a letter directed to her appellate counsel that requests counsel communicate with the bank on defendant's behalf. An opinion regarding defendant's handwriting analysis on the Chase Bank account was not submitted with the Standard 4 brief. Furthermore, although defendant asserted

that Speckin Laboratories prepared an opinion on defendant's handwriting, it similarly was not attached. Therefore, the factual predicate for the failure to investigate and prepare claim of ineffective assistance was not established.

### D. Failure to Object to Jenkins' Testimony Regarding a Threat

Finally, defendant contends that trial counsel was ineffective for failing to object to the admission of testimony by Jenkins that defendant threatened to "get her" when the attorneys were at sidebar with the judge. Although defendant labelled this issue as ineffective assistance, she asserts that the testimony was false and that its presentation constitutes prosecutorial misconduct. Because this issue was not raised in a statement of questions presented, it is waived. MCR 7.212(C)(5); *People v Unger*, 278 Mich App 210, 262; 749 NW2d 272 (2008).

At trial, Jenkins apparently expressed concern about the threat after it occurred. The officer in charge testified that he did not hear any statement, but he witnessed an exchange of expressions. The truth or falsity of Jenkins' testimony regarding a threat presented an issue for resolution by the jury, and there is no indication that the prosecutor manufactured the evidence or deliberately presented false testimony. See *Ericksen*, 288 Mich App at 197. This challenge also fails.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Kirsten Frank Kelly
/s/ Jonathan Tukel

-17-